989 F.2d 1390
 Fed. Sec. L. Rep. P 97,402, 38 Fed. R. Evid. Serv. 462
UNITED STATES of America, Plaintiff-Appellee,
v.
UNITED MEDICAL AND SURGICAL SUPPLY CORPORATION; C. Donald
Stone, Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert Morris BUCHANAN, Jr., Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
C. Donald STONE, Defendant-Appellant.
 Nos. 91-5844, 92-5242 and 92-5243.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 1, 1992.
Decided March 29, 1993.
 
 Eugene LeRoy Nettles, Sr., Nettles, Turbeville & Reddeck, Lake City, SC, Robert Woodford Sneed, Jackson, MS, argued (Marian Dawn Nettles, Nettles, Turbeville & Reddeck, Lake City, SC, Robert Lowry Wylie, III, Greenville, SC, Charles F. Blackburn, Sr., Perry, Kittrell, Blackburn & Blackburn, Henderson, NC, Cameron B. Littlejohn, Jr., Lewis, Babcock & Hawkins, Columbia, SC, on the brief), for defendants-appellants.
 Mary Gordon Baker, Asst. U.S. Atty., Charleston, SC, argued (John S. Simmons, U.S. Atty., Tammy G. Harthcock, Sp. Asst. U.S. Atty., Clarence Davis, Office of the U.S. Atty., on the brief), for plaintiff-appellee.
 Before MURNAGHAN, LUTTIG, and WILLIAMS, Circuit Judges.
 OPINION
 WILLIAMS, Circuit Judge:
 
 
 1
 This case arose out of a sixteen million dollar bond issue used to finance the development and construction of the Skylyn Hall Retirement Center in Spartanburg County, South Carolina. Robert M. Buchanan, Jr., C. Donald Stone, Unico Development Services, Inc., and United Medical and Surgical Supplies Corporation[1] were convicted of securities fraud, mail fraud, and conspiracy to violate federal securities law for their roles in the offer and sale of Skylyn Hall bonds. On appeal, the Defendants challenge their convictions and present five issues for our review:
 
 
 2
 (1) whether the district court erred in failing to dismiss the indictment on the basis of the applicable statute of limitations;
 
 
 3
 (2) whether the district court erred in concluding that a plea agreement signed by Stone in an earlier case did not bar his prosecution in this matter;
 
 
 4
 (3) whether the district court erred in concluding that there was sufficient evidence to support Buchanan's convictions and in denying his motion for a judgment of acquittal or, in the alternative, for a new trial;
 
 
 5
 (4) whether the district court abused its discretion by limiting the Defendants' cross-examination of one of the Government's expert witnesses; and,
 
 
 6
 (5) whether the district court abused its discretion by giving a prejudicial supplemental instruction in response to a jury question.
 
 
 7
 Finding no error, we affirm.
 
 I.
 
 8
 The facts in this case are long, complicated, and vigorously contested by the various parties. When viewed in the light most favorable to the Government, see United States v. Garcia, 868 F.2d 114, 115 (4th Cir.) (appellate courts reviewing the sufficiency of the evidence must examine the facts in the light most favorable to the government), cert. denied, 490 U.S. 1094, 109 S.Ct. 2439, 104 L.Ed.2d 995 (1989), the trial testimony established the following facts.
 
 
 9
 In 1983, the Reverend C. Benjamin Smith decided to build a retirement center in Spartanburg, South Carolina, which he planned to name Skylyn Hall. In late 1983, Smith engaged the accounting firm of Ernst & Whinney to perform a feasibility study on the proposed Skylyn Hall project. The preliminary report recommended that the 170-unit project have a pre-sale requirement of fifty percent.[2] Ernst & Whinney did not complete the final feasibility report because Smith was unable to obtain private financing for the project from a local bank. As a result, Smith called Buchanan to inquire whether his brokerage firm, Buchanan & Company, Inc., would underwrite the project.[3] Buchanan informed Smith that he would not participate unless Stone was also involved.
 
 
 10
 Smith, who had previously worked for Stone as a health care consultant at both Unico and United Medical, telephoned Stone on April 10, 1984. At Stone's request, Smith travelled to Greenville to discuss the Skylyn Hall project with Stone. During this meeting, Smith asked Stone for his assistance in bringing the project to fruition. The two men agreed that the project should be financed through a municipal bond issue using a nonprofit corporation as the project's owner. When Smith inquired how long it would take to close the bond issue, Stone responded that it would not take long because he had a nonprofit corporation, Retirement Horizons, "in his pocket." (3 Tr. 212.)[4] At the end of this meeting, Smith gave Stone a copy of the Ernst & Whinney preliminary feasibility study, and Stone said he would consider working on the project.
 
 
 11
 Within ten days, Stone sent Smith a one page Sources and Use Summary. The Summary stated that the proposed project would be a 200-unit facility financed by a $15 million bond issue. It also listed a $450,000 development fee, which was to be paid to Stone.
 
 
 12
 Smith believed he was entitled to a portion of the development fee because he had originated the idea of building Skylyn Hall and had spent a considerable amount of time attempting to develop the project prior to seeking Stone's assistance. After discussions with Stone, Smith drafted an agreement that named Unico as the project's developer and required Unico to pay Smith's company, Benan, Inc., $150,000 as a co-development fee. According to Smith, he lost all control of his project to Stone when he signed this contract.
 
 
 13
 Once Stone seized control of the Skylyn Hall project, he commissioned the accounting firm of MayZima & Company to perform a new feasibility study. Stone also negotiated a contract with Jerry Ingle of Salem Construction to be the project's contractor and named United Medical as the project's furniture, fixtures, and equipment (FFE) supplier. Stone also selected Retirement Horizons, a nonprofit corporation, to be the actual owner of Skylyn Hall, and Heritage Living, a company owned by the husband of Stone's secretary, to be a marketing consultant for the project. Smith was relegated to the position of project marketer.
 
 
 14
 Stone also asked Buchanan to be the project's underwriter. Buchanan agreed and named John Low of Low & Furby as underwriter's counsel. One of the major responsibilities of Buchanan, as underwriter, was to "inquire, investigate, and disclose" all material information concerning Skylyn Hall so that the information could be included in the Official Statement.[5] (J.A. at 295.) The Official Statement was compiled by Low & Furby from information obtained from Buchanan, Stone, Smith, Heritage Living, and all other entities to be involved in the development, construction, or early operation of the facility and was completed shortly before the bond closing on May 30, 1985.
 
 
 15
 At trial, several government witnesses testified that the Official Statement contained various misstatements and omissions of material fact. For example, the Official Statement did not disclose that there was a co-development contract between Unico and Benan or that Unico agreed to pay Benan $150,000 for development services. It also failed to disclose that Ernst & Whinney performed an earlier feasibility study which recommended only a 170-unit project with a fifty percent presale requirement, rather than a 200-unit facility.
 
 
 16
 Furthermore, the Official Statement contained an inaccurate listing of disbursements to be paid from the bond proceeds. It stated that the furniture, fixtures, and equipment contract (the FFE contract) provided for the furniture, fixtures, and equipment necessary for the project at the cost of $698,500. The Official Statement did not disclose that certain items were missing from the FFE contract, such as the carpeting, refrigerators, ranges, and range hoods. The Official Statement also failed to disclose that United Medical signed separate agreements to provide the missing fixtures and equipment for an additional $524,000 to be paid from the bond proceeds. Thus, the Official Statement inaccurately reported the total amount of money to be paid for the construction of the project by over $500,000.
 
 
 17
 The Government also produced testimony that in the Official Statement the Defendants should have disclosed Buchanan and Stone's poor track record with municipal bond issues securing the construction of health care facilities. As of January 1983, Buchanan & Company was involved in thirty-six bond issues that were experiencing financial difficulties or that had gone into default. Of these projects, approximately thirty bond issues were for retirement centers or nursing homes. In addition, a number of these projects were not only underwritten by Buchanan & Company, but were also developed by Stone and Unico. All of these problem projects were detailed in a memorandum sent to Buchanan. Low testified that had he been aware of the number of failing projects or had he seen the memorandum, he would have disclosed the general problems with retirement facility bond issues in the Official Statement.
 
 
 18
 Moreover, while the Official Statement did list several projects developed by Stone, it did not explain that a number of these projects were experiencing financial troubles. Thomas Snyder, an attorney qualified by the district court as an expert in broker/dealer compliance in the areas of underwriting and securities law, testified that the failure to disclose all of the negative information concerning these projects rendered the Official Statement misleading because it led the prospective investor to believe that they were successful projects.
 
 
 19
 The Official Statement also failed to disclose that the Skylyn Hall bond issue did not comply with Buchanan & Company's internal requirements for retirement center bond issues. Prompted by the number of failing bond issues used to finance retirement centers, Robert Fairly, Buchanan & Company's Executive Vice President, sent Buchanan and the underwriting department a memo entitled "Underwriting Requirements for Retirement Center Bond Issues," which was dated June 15, 1984. This memo outlined six requirements[6] for future retirement center bond issues:
 
 
 20
 (a) provide a minimum of $3,000 per unit for marketing funds;
 
 
 21
 (b) use experienced management with a successful track record;
 
 
 22
 (c) require that a minimum of fifty percent of the units be pre-sold prior to the bond closing;
 
 
 23
 (d) escrow the development fee until the project has been successfully rented;
 
 
 24
 (e) require that significant cash or other verifiable equity be used to fill the debt service reserve fund;[7] and,(f) require that the debt service reserve fund be fully funded.
 
 
 25
 Despite these requirements, the development fee was paid to Unico at the bond closing instead of being placed in escrow. In addition, the marketing fund was allocated at less than $3,000 per unit.[8] Moreover, the debt service reserve fund was not fully funded.
 
 
 26
 Other known shortfalls in the project were the lack of experienced management and the failure to impose a fifty percent pre-sale requirement. As a compromise, however, Buchanan & Company demanded that Mary Lancaster, an experienced marketer and manager of health care facilities, be retained as marketing director and that the marketing team pre-sell twenty-five percent of the units before the bond issue closed. The Official Statement falsely represented that both of these compromise conditions had been met.
 
 
 27
 Lancaster testified that she never accepted the job as marketing director and that several weeks before the bond closing she had specifically informed Smith she could not become the project's marketing director. Although she had signed a marketing consultant contract at Smith's request on May 10, 1985, the contract did not name her as marketing director.[9] Furthermore, she spent fewer than ten hours working on the project and Smith stopped asking for her help shortly after the bond closing. While Buchanan testified that he was unaware that Lancaster had not been retained as marketing director, Snyder testified that as underwriter, he had a duty to investigate whether Lancaster had in fact been hired.
 
 
 28
 The representation concerning the satisfaction of the pre-sale requirement was also false. The Official Statement represented that the project's marketer was required to, and did, pre-sell twenty-five percent of the units and receive a check as a deposit for at least $1,000 from each of the purchasers. Smith did not learn of the presale and deposit requirements until he attended a due diligence meeting held six weeks before closing. When Smith objected, Stone privately informed Smith after the meeting that Smith could easily raise the $60,000 from his rich friends and that this was how pre-sale requirements were usually satisfied. Between the due diligence meeting and the bond closing, Smith collected $62,000 from his friends. In the week prior to the bond closing, Smith led the parties involved in the Skylyn Hall bond issue to believe that he had over sixty executed pre-sale contracts and had collected over $60,000 from prospective purchasers as deposits when in fact he had not.[10] He also submitted to Low his attorney's signed certification that Smith had satisfied the pre-sale requirement.
 
 
 29
 Snyder testified that Buchanan & Company should have reviewed the individual contracts and then should have disclosed that the presale requirement had not been satisfied. Snyder believed that Buchanan & Company's duty to investigate this matter was especially strong because Low had not reviewed the contracts and the idea of requiring pre-sales was imposed by Buchanan & Company.
 
 
 30
 Despite the nondisclosure and misstatements in the Official Statement, Buchanan called the various attorneys involved in the project and strongly encouraged closing the project by the end of May. When the bond issue closed on May 30, 1985, Buchanan's companies received approximately $1,700,000[11] and Stone's companies received approximately $1,500,000 from the bond proceeds. Predictably, the bond issue experienced financial problems almost from the beginning.
 
 
 31
 At trial, the Government argued that Buchanan insisted on closing the project on May 30, even though the Official Statement was not accurate, because he and Stone needed the money from the Skylyn Hall bond issue to save some of their other failing projects. In support of their argument, the Government presented Nancy Jones, a certified public accountant, who testified that in her expert opinion Stone, Buchanan, and various other entities involved in the project used the money from the Skylyn Hall bond issue to pump money into other failing projects. Jones testified that Heritage Living, Skylyn Hall's owner, received $133,200 from the Skylyn Hall closing and comingled that money with money it received from other projects owned by Buchanan and/or Stone. Heritage Living's records reflected, however, that the company only made one twenty-five dollar expenditure for Skylyn Hall, implying that the remainder of the Skylyn Hall money was used for other projects.
 
 
 32
 Jones also testified about the operation of Countryside Manor, a project in which Stone had an ownership interest and was a guarantor, and in which Buchanan had contributed his personal funds in order to keep the project from failing. Jones testified that the project did not make the first deposit from a purchaser until November 1985, one year after its bond closing, and that Buchanan and Stone were pumping money into the project to enable it to make its monthly payments. On May 31, 1985, United Medical received a check from the Skylyn Hall bond closing and then wrote a check to Countryside Manor. Countryside Manor deposited the United Medical check and wrote a check to C & S Bank on the same day for its monthly payment. This payment prevented the Countryside Manor project from defaulting, thereby saving Stone from being held personally liable for the project's debt and saving Buchanan's investment in the project.
 
 
 33
 Unfortunately, the Skylyn Hall bond issue later defaulted and foreclosure proceedings were instituted in May 1987. The project was finally sold in November of 1987 for approximately $5.6 million.
 
 
 34
 The Government sought and obtained a twenty-one count indictment against the Defendants.[12] Count 1 alleged that the Defendants conspired to commit securities fraud. Counts 2-11 alleged that they committed securities fraud in the sale of the Skylyn Hall bonds, or aided and abetted in the fraud, by using an Official Statement that contained misstatements or omissions of material fact. Counts 12-21 alleged that the Defendants committed mail fraud by committing securities fraud through the United States mail. At trial, and in support of the mail and securities fraud counts, the Government presented various witnesses who testified they received an Official Statement through the mail and purchased Skylyn Hall bonds from Buchanan & Company on the following dates:
 
 
 35
 Counts 2 & 12--Amy Adams--January 26, 1986;
 
 
 36
 Counts 5 & 15--Elbert Menees--April 16, 1986;
 
 
 37
 Counts 8 & 18--David Furman--May 27, 1986;
 
 
 38
 Counts 9 & 19--John Myers--June 3, 1986;
 
 
 39
 Counts 10 & 20--Henry Struthers--July 16, 1986; and,
 
 
 40
 Counts 11 & 21--Julius Hoffman--August 14, 1986.
 
 
 41
 After the close of its case, the Government dismissed the other securities and mail fraud counts, specifically counts 3, 4, 6, 7, 13, 14, 16, and 17.[13] The Defendants were convicted on all remaining counts.
 
 II.
 
 42
 The first issue is whether the district court erred in denying the Defendants' pre-trial motion to dismiss the indictment as time-barred by the statute of limitations. Because the Defendants' challenge is not to the existence of the facts contained in the indictment, but whether those facts demonstrate a failure timely to prosecute their cases, resolution of this issue turns on questions of law which are reviewed de novo. See Meekins v. United Transp. Union, 946 F.2d 1054, 1057 (4th Cir.1991) (questions of law reviewed de novo).
 
 
 43
 To satisfy the statute of limitations, an indictment for conspiracy, mail fraud, or securities fraud must be brought within five years of the crime. See 18 U.S.C. § 3282 (1988) (setting forth the general five-year statute of limitations for non-capital crimes); United States v. Scop, 846 F.2d 135, 138 (2d Cir.) (applying § 3282 to prosecutions for conspiracy, mail fraud, and securities fraud), modified in part on rehearing, 856 F.2d 5 (2d Cir.1988). The limitations period begins to run when the crime is complete. Pendergast v. United States, 317 U.S. 412, 418, 63 S.Ct. 268, 270, 87 L.Ed. 368 (1943). Because the Defendants were indicted on January 23, 1991, their convictions can only be sustained if each offense in question was completed after January 23, 1986.
 
 
 44
 Mail or securities fraud is not complete, and the statute of limitations does not begin to run, until the sale of the security or the use of the mail. United States v. Read, 658 F.2d 1225, 1240 (7th Cir.1981). Thus, a securities and mail fraud prosecution falls within the statute of limitations if the use of the mails or the sale of the security occurred within five years of the indictment. See United States v. Dunn, 961 F.2d 648, 650 (7th Cir.1992); Scop, 846 F.2d at 139; United States v. Perholtz, 842 F.2d 343, 365 (D.C.Cir.) (per curiam), cert. denied, 488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988); United States v. Ashdown, 509 F.2d 793, 798 (5th Cir.), cert. denied, 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975); United States v. Blosser, 440 F.2d 697, 699 (10th Cir.1971). A defendant who merely aided and abetted in the fraud and performed all of his acts in relation thereto prior to the mailing and outside the limitations period nonetheless may be prosecuted for his role where the fraud was completed inside the limitations period. See Read, 658 F.2d at 1240.
 
 
 45
 All of the securities and mail fraud counts involved mailings and sales of securities made after January 23, 1986. Because all of these crimes were completed within the limitations period, prosecution was not time-barred. See id.; United States v. Andreas, 458 F.2d 491, 491 (8th Cir.) (prosecution for a scheme to defraud devised outside limitations period but continued into limitations period is permissible), cert. denied, 409 U.S. 848, 93 S.Ct. 54, 34 L.Ed.2d 89 (1972); Blosser, 440 F.2d at 699 (mail fraud prosecution was timely if a mailing in furtherance of the scheme occurred within the five years before the indictment even though the scheme to defraud was devised outside of the limitations period).
 
 
 46
 A prosecution for conspiracy is timely if, during some portion of the limitations period, (1) the agreement between the conspirators was in existence; and (2) at least one overt act in furtherance of that conspiratorial agreement occurred. Grunewald v. United States, 353 U.S. 391, 396-97, 77 S.Ct. 963, 969-70, 1 L.Ed.2d 931 (1957). The fact that the conspiracy began outside the limitations period will not prevent prosecution as long as at least one overt act in furtherance of the conspiracy occurred within five years of the indictment. See Scop, 846 F.2d at 139; United States v. Head, 641 F.2d 174, 177 (4th Cir.1981).
 
 
 47
 The Defendants argue that their prosecutions for conspiracy were time-barred because, if a conspiracy existed, it ended prior to January 23, 1986, and no overt act occurred after that date. Specifically, the Defendants argue that the purpose of the alleged conspiracy was completed by the end of 1985 when the total of $16 million in bonds were sold on the primary market. Because the Government only proved that sales on the secondary market occurred within the five years preceding the indictment, the Defendants argue that these sales were made after the completion of the conspiracy and therefore cannot be overt acts in furtherance thereof. See United States v. Georgalis, 631 F.2d 1199, 1204-05 (5th Cir.1980) (letters mailed after a scheme to defraud has reached fruition were not in furtherance of the scheme). We find this argument unpersuasive.
 
 
 48
 A conspiracy ends "when its central purpose has been accomplished." United States v. McKinney, 954 F.2d 471, 475 (7th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 662, 121 L.Ed.2d 587 (1992); see also Grunewald, 353 U.S. at 399-406, 77 S.Ct. at 971-75. The central purpose of the Skylyn Hall conspiracy was to obtain money from the sale of Skylyn Hall bonds through the use of an Official Statement that contained false and misleading information as well as material omissions. Neither the indictment nor the evidence presented at trial indicates that the conspiracy was limited to an agreement to commit securities fraud on the primary market.[14] In addition, the sales in question, while made on the secondary market, were sold to the purchasers by Buchanan & Company and were distributed with the fraudulent Official Statement.[15] Furthermore, the anti-fraud provisions of the federal securities laws do not distinguish between primary and secondary markets. In United States v. Naftalin, 441 U.S. 768, 777-78, 99 S.Ct. 2077, 2083-84, 60 L.Ed.2d 624 (1979), the Court held that the anti-fraud provisions were a departure from the rule that the Securities Act only concerned first time offers of securities. Instead, the anti-fraud provisions cover any scheme involving sales on the primary or secondary market. Id. Thus, the Defendants' argument has no basis either in law or in fact.
 
 
 49
 Defendants also argue unpersuasively that the secondary market sales should not be considered in furtherance of the conspiracy because the Defendants were unable to predict or foresee sales by the primary bond holders. In support of their position, the Defendants refer to a provision in the Official Statement which warns prospective investors that there is no guarantee that a secondary market for the bonds will exist. To the contrary, this disclaimer clearly evidences the Defendants' consideration that there may be secondary sales and represents only their attempt to avoid any market guarantee. Defendants admit Buchanan & Company arranged for investors to sell their bonds back to Buchanan & Company for resale. Defendants also made no attempt to restrict the false and misleading Official Statement to initial investors, nor did they withdraw or amend the Statement after the primary sales. Instead, the secondary market investors relied upon the same Official Statement to disclose all material facts regarding the Skylyn Hall bond issue. Thus, the existence of the conspiracy continued within five years of the indictment.
 
 
 50
 Moreover, at least one overt act was performed during the limitations period. Each sale of a Skylyn Hall bond that occurred during the limitations period, such as the sale to Julius Hoffman on August 14, 1986, was an overt act in furtherance of the conspiracy because the sales needed to be made in order to continue the flow of money through the project to the Defendants.
 
 
 51
 Therefore, because the conspiracy was in existence, and at least one sale of a bond was completed after January 23, 1986, the Defendants' statute of limitations defense with respect to their conspiracy convictions fails.
 
 III.
 
 52
 The second issue is whether a plea agreement between Stone and the Government in a prior case barred his prosecution for actions in connection with the Skylyn Hall bond issue.
 
 
 53
 During the first half of the 1980s, Stone was the subject of numerous federal investigations related to his involvement in the operation and financing of various health care facilities in South Carolina. In early 1985, he was indicted for fraudulent financing in the sale of medical equipment and furnishings to several health care institutions. Although that indictment was dismissed, during that same year a trial under a second indictment resulted in Stone's conviction for one count of violating a Medicaid anti-kickback statute.
 
 
 54
 In May of 1985, Stone was again indicted for his operation of a South Carolina nursing home. This indictment (the Medicaid fraud indictment) alleged that Stone conspired to defraud the Department of Health and Human Services (HHS), submitted a false cost report to HHS, made false declarations to a grand jury, and failed to disclose related-party financial transactions as required under Medicaid regulations. Stone signed a plea agreement with the United States on May 27, 1986. Under this agreement, Stone pled guilty to one count of filing a false cost report in violation of 18 U.S.C. § 1001 (1988) in exchange for the Government dismissing the other charges. Pursuant to his plea agreement, Stone served a term of incarceration, paid a fine of $10,000, and paid $405,741.05 in restitution. The plea agreement contained the following language:
 
 
 55
 8. The Attorneys for the Government agree not to prosecute the Defendants for other offenses committed prior to the date of this Agreement in the District of South Carolina of the same or similar character as those cited herein or for other offenses committed prior to the date of this Agreement in the District of South Carolina which are based on the same act or transaction or constitute a part of a common scheme or plan as those cited herein. Rule 8(a), F.R.Crim.P.
 
 
 56
 (J.A. at 49 (emphasis added).)
 
 
 57
 Stone unsuccessfully moved to dismiss the Skylyn Hall indictment on the ground that paragraph 8 of the plea agreement barred prosecuting him for activities in connection with the Skylyn Hall bond issue. Stone argues that the indictment should have been dismissed because he intended for the plea agreement to absolve him from all of his fraudulent activities in relation to his development, construction, and operation of health care facilities in South Carolina. See Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971) (holding that the government must be held to a promise made to a defendant during plea negotiations if that promise induced the defendant's guilty plea); United States v. Jureidini, 846 F.2d 964, 965-66 (4th Cir.1988) (courts must ensure that the bargain struck between the government and the defendant is not frustrated).
 
 
 58
 When called upon to interpret a written plea agreement in a federal prosecution, courts draw upon contract law as a guide. United States v. Harvey, 791 F.2d 294, 300 (4th Cir.1986). Where a written plea agreement is unambiguous, and there is no evidence of governmental overreaching, the agreement should be interpreted and enforced according to the terms contained therein. Id. Stone does not argue that the Government made any promises that were not memorialized in the written plea agreement or engaged in any overreaching. Instead, Stone's claim for relief is based on the language of the plea agreement, specifically paragraph eight.
 
 
 59
 In Stone's plea agreement, the Government promised not to prosecute him "for other offenses committed prior to the date of this Agreement ... of the same or similar character as those cited herein."[16] (J.A. at 49.) Thus, under the plea agreement, the Government may prosecute Stone provided one of two conditions is met. The Government may prosecute him for offenses that are not of the "same or similar character" as the offense cited in the plea agreement. But even if an offense is not of the "same or similar character," the Government may prosecute if the offense occurred after the date of the plea agreement. Because we conclude that the Skylyn Hall offenses are not of the same or similar character as the offense contained in the plea agreement, we do not need to discuss the second condition.
 
 
 60
 The only offense cited in the plea agreement is the filing of a false cost report with a federal agency (HHS) in violation of 18 U.S.C. § 1001 (1988).[17] Clearly, securities fraud, mail fraud, and conspiracy to commit securities fraud are not "of the same or similar character" as filing a false cost report with a federal agency; they are prosecuted under different sections of the criminal code and they involve different regulations (securities v. Medicaid), different investigatory agencies (FBI v. HHS), and different victims (the investing public v. a federal agency). Furthermore, the Official Statement which is at the heart of the Skylyn Hall offenses and the false Medicaid cost report filed with HHS were made for different purposes.
 
 
 61
 Stone contends that the phrase "same or similar character to those cited herein" is ambiguous. Even if we were to accept that this language is ambiguous, the interpretation Stone urges--that the agreement bars all prosecutions for fraud related to the development and operation of health care facilities--is completely unreasonable given the plain language of the agreement and the context of this case.[18] We reject it accordingly. Whatever Stone's intentions may have been in signing the plea agreement, the Government cannot be required to abide by a promise that it never made. See United States v. Fentress, 792 F.2d 461, 464 (4th Cir.1986) (government is not bound by promises it did not make).
 
 
 62
 Because Stone's earlier plea does not bar the Government's prosecution of Stone for the Skylyn Hall offenses, we affirm the district court's denial of Stone's motion to dismiss and Stone's subsequent convictions for these offenses.
 
 IV.
 
 63
 The third issue presented in this appeal is whether the district court erred in denying Buchanan's motion for a judgment of acquittal or, in the alternative, for a new trial. We review the district court's denial of a motion for a judgment of acquittal de novo. See Garcia, 868 F.2d at 115. The jury's verdict must be accepted if, after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); United States v. Whitfield, 715 F.2d 145, 148 (4th Cir.1983) (citing Jackson ). This standard requires us to affirm Buchanan's convictions if there is substantial evidence of each element of each offense. See Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). In reaching this conclusion, we cannot make our own credibility determinations but must assume that the jury resolved all contradictions in testimony in favor of the Government. See United States v. Saunders, 886 F.2d 56, 60 (4th Cir.1989).
 
 A. Securities Fraud
 
 64
 Under federal securities law, it is unlawful
 
 
 65
 for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly ... (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading....
 
 
 66
 15 U.S.C. § 77q(a) (1988) (emphasis added). A person can only be convicted for willful violations of this provision. 15 U.S.C. § 77x (1988). To sustain Buchanan's convictions under these sections, therefore, we must find that there was substantial evidence presented at trial to establish each of the following facts:
 
 
 67
 (1) Buchanan offered to sell or sold a security through the use of the mails;
 
 
 68
 (2) he used a statement that contained either material misstatements or omissions of material fact; and,
 
 
 69
 (3) his actions with regards to elements (1) and (2) were willful.
 
 
 70
 We find that there is substantial evidence in the record to support the existence of each requisite fact. First, there is sufficient evidence that Buchanan sold a security. In each of Buchanan's convictions for securities fraud, a purchaser of a Skylyn Hall bond testified that he or she purchased the bond from a broker at Buchanan & Company.[19] A bond is a security under federal securities law. 15 U.S.C. § 77b(1) (1988).
 
 
 71
 Furthermore, Buchanan is responsible for the bond sales made by his brokers because he was responsible for making all final decisions in his wholly-owned company, and, thus, his position gave him the power to prevent the sales and correct the Official Statement. Buchanan is also criminally liable for these sales because he anticipated and expected that his brokers would make sales of Skylyn Hall bonds. See United States v. Kenofskey, 243 U.S. 440, 443, 37 S.Ct. 438, 439, 61 L.Ed. 836 (1917) (a principal is criminally liable for a mailing performed by his agent when the mailing was intended or foreseen by the principal); United States v. Steed, 674 F.2d 284, 289 (4th Cir.) (citing Kenofskey, 243 U.S. at 443, 37 S.Ct. at 439), cert. denied, 459 U.S. 829, 103 S.Ct. 67, 74 L.Ed.2d 68 (1982).
 
 
 72
 Second, each of the sales was accomplished through the use of a statement that contained misstatements and omissions of material fact. At trial, various Government witnesses testified that the Official Statement sent to Skylyn Hall bond purchasers contained numerous misstatements and omissions of material facts, including the following:
 
 
 73
 -- the failure to disclose that numerous municipal bond issues underwritten by Buchanan and developed by Stone were experiencing financial troubles;-- the inclusion in the Official Statement of several projects underwritten by Buchanan and developed by Stone without alerting the prospective purchasers that the projects were experiencing financial problems;
 
 
 74
 -- the failure to disclose that a large number of retirement centers were experiencing financial difficulties, causing them to default on their bond issues;
 
 
 75
 -- the statement that twenty-five percent of the units had been pre-sold and that the prospective residents had deposited at least $1,000 each when only four of the required sixty pre-sales had occurred;
 
 
 76
 -- the statement that Mary Lancaster, an experienced nursing home and retirement center marketer and manager, had been retained to act as director of marketing when, in fact, she had declined to accept the position;
 
 
 77
 -- the failure to disclose that Benan had signed a contract with Unico that required Unico to pay Benan a codevelopment fee of $150,000;
 
 
 78
 -- the failure to disclose that the FFE contract did not provide all of the necessary equipment for each of the units and that the missing fixtures would be provided by United Medical at a cost of almost $700,000 to be paid from the bond proceeds; and,
 
 
 79
 -- the failure to disclose that the requirements imposed upon this project did not meet Buchanan & Company's internal requirements for bond issues.
 
 
 80
 The Defendants presented evidence at trial that some of the above mentioned items were either not misstatements or were not material facts. For example, Buchanan argued that the track record of the developer or underwriter was not a material fact because numerous witnesses testified that they had never seen an Official Statement that disclosed such a record.[20] Government witnesses, however, testified that, even if they had not previously seen such a disclosure, they felt disclosure was warranted in this case. In addition, some of the bond purchasers testified that this information would have been material to their decisions. When faced with conflicting testimony, the jury was entitled to believe the witnesses who testified that the track record was a material fact and should have been disclosed. On appeal, we must accept their credibility determination. Saunders, 886 F.2d at 60.
 
 
 81
 Buchanan also argues that there was no evidence presented that Buchanan & Company failed to follow its own internal procedures during the Skylyn Hall bond issue because all of Buchanan's employees testified that the memo drafted by Rob Fairly only set forth guidelines and did not establish mandatory company policy. The jury, however, was entitled to rely upon the actual language of the memorandum which referred to "minimum requirements" instead of believing this testimony. Once again, a factual issue resolved by the jury cannot be set aside as long as there is substantial evidence to support the jury's verdict.
 
 
 82
 Third, we note that Buchanan does not specifically challenge the sufficiency of evidence to establish that he willfully committed securities fraud. Instead, he argues that his good faith reliance on counsel is a complete defense to his conviction. Good faith reliance on the advice of counsel is not a complete defense to an allegation of willful misconduct, but is merely one factor a jury may consider when determining Buchanan's state of mind. United States v. Custer Channel Wing Corp., 376 F.2d 675, 683 (4th Cir.), cert. denied, 389 U.S. 850, 88 S.Ct. 38, 19 L.Ed.2d 119 (1967). This issue was presented to the jury and the jury evidently decided that Buchanan's interaction with his counsel did not preclude a finding that he acted willfully.
 
 
 83
 The evidence presented at trial supports the jury's conclusion. Buchanan did not specifically ask attorney Low for advice on whether certain items should be disclosed. Indeed, he merely gave Low the preliminary feasibility study performed by MayZima and let Low take over the investigation. Buchanan did not voluntarily disclose to Low any further information such as the Fairly memorandum setting forth requirements for bond issues and the memorandum setting forth thirty-eight problem projects. Instead, he waited for Low to approach him with a specific question. If Low did not ask for specific information, Buchanan did not provide it. Buchanan's failure to disclose all material information to Low without first being asked for the information entitled a jury to find that Buchanan did not rely in good faith on the advice of counsel, but instead willfully avoided his duty to disclose all material facts. Thus, a jury could find Buchanan guilty of securities fraud.
 
 B. Mail Fraud
 
 84
 To affirm Buchanan's convictions for mail fraud under 18 U.S.C.A. § 1341 (West Supp.1992), there must be sufficient evidence to support the finding of two essential elements: "(1) the existence of a scheme to defraud, and (2) the mailing of a letter, etc., for the purposes of executing the scheme." United States v. Murr, 681 F.2d 246, 248 (4th Cir.), cert. denied, 459 U.S. 973, 103 S.Ct. 307, 74 L.Ed.2d 286 (1982). The essence of this crime is that the defendant used the mail as an instrument of his crime. Id.
 
 
 85
 The evidence clearly supports the existence of each element. Buchanan used an Official Statement that contained "false or fraudulent pretenses, representations, or promises" to obtain money from purchasers of Skylyn Hall bonds, which constituted a scheme to defraud. See 18 U.S.C.A. § 1341 (West Supp.1992). Furthermore, all of the bond purchasers that testified at trial stated that they had received the Official Statement and invoices for their bonds through the mail from a broker employed by Buchanan & Company.
 
 
 86
 The second element is satisfied even though Buchanan personally did not mail any of the invoices or Official Statements, because a mailing by Buchanan's agent constitutes a mailing for purposes of this statute. See Kenofskey, 243 U.S. at 443, 37 S.Ct. at 439 (a principal is criminally liable for a mailing performed by his agent when the mailing was intended or foreseen by the principal). Moreover, the mailings of the Official Statements and invoices selling the bonds were for the purpose of executing the scheme because without the sale of the bonds, no money could be realized. Because both elements of this offense were satisfied, we affirm Buchanan's convictions for counts 12, 15, 18, 19, 20, and 21.
 
 C. Conspiracy to Commit Securities Fraud
 
 87
 We must affirm Buchanan's conviction for conspiracy if there is sufficient evidence in the record to establish each of the following elements:
 
 
 88
 (1) two or more persons or entities came to a mutual understanding to attempt to commit a crime;
 
 
 89
 (2) Buchanan willfully became a member of the conspiracy; and,
 
 
 90
 (3) at least one member of the conspiracy performed an overt act in furtherance of the conspiracy.
 
 
 91
 Cf. United States v. Weaver, 882 F.2d 1128, 1143 (7th Cir.) (conviction for conspiracy to transfer altered money orders through the mail), cert. denied, 493 U.S. 968, 110 S.Ct. 415, 107 L.Ed.2d 380 (1989).
 
 
 92
 The thrust of Buchanan's argument on this issue is that there was no evidence to establish that he willfully became a member of any conspiracy which may have existed. Instead, Buchanan argues that the evidence merely established that he made a few phone calls at the beginning of the project and then turned the matter over to his attorney.
 
 
 93
 "Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and collocation of circumstances.' " Glasser, 315 U.S. at 80, 62 S.Ct. at 469. In addition, "[i]t is not necessary to prove a formal agreement to establish a conspiracy in violation of federal law; a tacit or mutual understanding among or between the parties will suffice." United States v. DePew, 932 F.2d 324, 326 (4th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 210, 116 L.Ed.2d 169 (1991). After reviewing the record, we hold that the circumstances surrounding the Skylyn Hall bond issue and the operation of other facilities co-owned in part by Stone and Buchanan allowed the jury to conclude that Buchanan willfully joined the conspiracy.
 
 
 94
 Buchanan did not agree to underwrite Skylyn Hall when approached by Smith; he informed Smith that he could not be involved in the project unless Stone was also involved. Once Stone contacted Buchanan, however, Buchanan agreed to underwrite the project. In addition, Stone and Buchanan were partial owners and personal guarantors of several facilities in the southeast that were experiencing financial problems. Both men pumped large sums of money into these projects. One of these projects, Countryside Manor, did not yet have sufficient profits to meet its payments, one of which was due at the first of June, 1985.
 
 
 95
 Buchanan insisted that the Skylyn Hall bond issue close by May 30, 1985, and the issue closed on that date even though the Official Statement did not contain complete or accurate information. On that same day, funds were distributed to United Medical who gave a check to Countryside Manor. Countryside deposited the United Medical check and then paid its monthly payment, thus preventing the facility from going into default, Stone from having to pay on his guarantee, and Buchanan from losing his investment in Countryside Manor.[21]
 
 
 96
 The evidence is sufficient to establish that Stone and Buchanan were involved in a bond kiting scheme in which they used an Official Statement containing fraudulent representations to sell Skylyn Hall bonds in order to receive money to pay for their other failing projects. The fact that Buchanan did not join the project until asked by Stone, and the fact that Buchanan and Stone were involved in a number of such projects, together with all of the other circumstances of this case, justified a finding by the jury that Buchanan willfully entered into such a conspiracy.
 
 D. Summary
 
 97
 Viewing all of the evidence in the light most favorable to the Government, there is sufficient evidence to allow a jury to find that the Government proved beyond a reasonable doubt each of the elements of each offense. We therefore affirm the district court's denial of Buchanan's motion for a judgment of acquittal.
 
 
 98
 We also affirm the district court's denial of Buchanan's motion for a new trial. Such motions are left to the discretion of the district court and should only be granted in limited circumstances. United States v. Arrington, 757 F.2d 1484, 1486 (4th Cir.1985); United States v. Shipp, 409 F.2d 33, 36-37 (4th Cir.), cert. denied, 396 U.S. 864, 90 S.Ct. 140, 24 L.Ed.2d 117 (1969). Buchanan moved for a new trial on the basis that the verdict was against the weight of the evidence. The district court denied the motion, and we have already determined that substantial evidence supports Buchanan's conviction. In such circumstances, we will not second guess the district court's decision not to grant a new trial.
 
 V.
 
 99
 The next issue is whether the district court abused its discretion in curtailing the Defendants' cross-examination of one of the Government's expert witnesses, Thomas Snyder. The Defendants argue that the district court erred by not permitting them to ask Snyder how much he was being paid for his trial testimony.
 
 
 100
 In Tights, Inc. v. Acme-McCrary Corp., 541 F.2d 1047, 1061-62 (4th Cir.), cert. denied, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976), we held that "[w]hile it is true that a witness may ordinarily be cross-examined as to his financial interest in a transaction, it is also recognized that the trial judge has broad powers to regulate the nature and extent of such cross-examination." In addition, in United States v. Greenwood, 796 F.2d 49, 54 (4th Cir.1986), we set forth the rule that "[o]nce some inquiry into bias has been permitted, a trial court has discretion to limit the cross-examination on the grounds of, inter alia, confusion of the issues or marginal relevance."[22]
 
 
 101
 The colloquy on this issue, which is set forth verbatim in the margin,[23] demonstrates that the district court permitted the Defendants to establish that Snyder's company was being compensated for his testimony. Counsel also solicited information about how the contractual relationship between the Government and Snyder worked. The district court did not permit counsel to continue inquiry into the amount Snyder was being paid after Snyder testified that he had not received any money yet, described the formula for calculating his pay, and explained that his company would receive the pay. This limitation was not an abuse of discretion because the district court allowed the Defendants to establish the possible prejudice of the witness. See Greenwood, 796 F.2d at 54.
 
 
 102
 In addition, the district court allowed the Defendants to review the contract between Snyder and the Government. Thereafter the Defendants failed to make further inquiries, or ask permission to make further inquiries. If, after reviewing Snyder's contract for compensation, further inquiry was necessary, the Defendants should have raised an objection.
 
 VI.
 
 103
 The final issue for our review is whether the district court erred by giving an allegedly prejudicial supplemental instruction in response to a jury question. The Defendants argue that the instruction was prejudicial because it erroneously focused the jury's attention on only one portion of the court's original instructions.
 
 
 104
 "[A]n error in jury instructions will mandate reversal of a judgment only if the error is determined to have been prejudicial, based on a review of the record as a whole." Wellington v. Daniels, 717 F.2d 932, 938 (4th Cir.1983). We will not reverse a judgment because of an erroneous jury instruction if "viewed as a whole and in the context of the trial, the charge was not misleading and contained an adequate statement of the law to guide the jury's determination." United States v. Park, 421 U.S. 658, 675, 95 S.Ct. 1903, 1913, 44 L.Ed.2d 489 (1975). When faced with a challenge to a supplemental instruction, we inquire whether the supplemental instruction fairly responded to the jury's question without creating prejudice. See United States v. Nunez, 889 F.2d 1564 (6th Cir.1989).
 
 
 105
 In this case, the jury submitted the following question to the district court:
 
 
 106
 If we felt like the sale of bonds was part of a conspiracy, then does sale of bonds after January 23, 1986, does that [sic] rule out the statute of limitations? We prefer not to go back to the courtroom for this answer.
 
 
 107
 (J.A. at 350.) After discussing a proposed response with counsel, the district court sent the jury the following response:
 
 To the jury:
 
 108
 In response to your question, in order for any defendant to be convicted of conspiracy, the government must prove by competent evidence beyond a reasonable doubt the four elements or basic acts required to establish guilt of a conspiracy. You should carefully reread the Court's instructions on the law of conspiracy. As to as to [sic] requirements relating to commission of an "overt act" as that term is defined, the statute of limitations would require the commission of an overt act, as that term is defined, after January 23, 1986 before any defendant could be convicted for the conspiracy as alleged in count one in this indictment. If that is not perfectly clear to each member of the jury, you should seek further explanation from the Court.
 
 
 109
 (J.A. at 350-51.)
 
 
 110
 The Defendants argue that the supplemental instruction improperly focused the jury's attention on the nexus between the sale of bonds and overt acts, forcing the jury to draw the conclusion that the sale of a bond was an overt act. We do not agree. The supplemental instruction specifically informed the jury that they must determine if an overt act happened and referred the jury to the court's original instructions to determine what constituted an overt act. We also note that even if the instruction allowed the jury to conclude the sale of a bond was an overt act, the instruction would not be prejudicial because, as discussed in section II of this opinion, the sales were overt acts.
 
 
 111
 The Defendants also challenge the district court's failure to reinstruct the jury that they had to reach a unanimous verdict. No decision of this court has required such an instruction in conjunction with all supplemental instructions. Furthermore, the authority upon which the Defendants rely, United States v. Duncan, 850 F.2d 1104 (6th Cir.1988), is distinguishable and would not require such an instruction in this case. In Duncan, the supplemental instruction highlighted the fact that there were various theories available for the jury to use in reaching a guilty verdict. Duncan only held that when the court's supplemental instruction gives a jury different alternatives for reaching a verdict, the jury must be reinstructed that they must unanimously agree on the theory under which they convict the defendant. Id. at 1114-15. Duncan does not apply here because the supplemental instruction did not give the jury different alternatives for reaching their verdict.
 
 
 112
 Viewed in the context of this trial, we hold that the supplemental instruction was not misleading, fairly answered the jury's question without creating prejudice, and gave an accurate description of the law on the subject. Therefore, the district court did not abuse its discretion in its wording of the instruction and did not err in declining to reinstruct the jury as to unanimity.
 
 VII.
 
 113
 For the reasons discussed above, we affirm the judgments of the district court.
 
 
 114
 AFFIRMED.
 
 
 
 [1]
 Stone was the controlling shareholder of both Unico and United Medical. At the time of the incidents alleged in the indictment, he was Unico's President and United Medical's Executive Vice President. In addition, various Government witnesses testified that Stone controlled the operations of both companies
 
 
 [2]
 The pre-sale requirement would have obligated the marketer of the project to have signed purchase agreements, along with an accompanying deposit, for fifty percent of the individual units prior to the bond issue closing
 
 
 [3]
 Buchanan was the President and sole shareholder of Buchanan & Company. Robert Fairly, Buchanan & Company's Vice President, testified that Buchanan was in charge of the company's underwriting department and was responsible for making final decisions
 
 
 [4]
 Cites in the form of (__ Tr. ___) refer to testimony contained in the trial transcript. Cites in the form of (J.A. at __) refer to material contained in the Joint Appendix
 
 
 [5]
 The Official Statement is a prospectus that is distributed to potential bond purchasers. Under federal securities law, the prospectus may not contain a false statement or omission of material fact. See 15 U.S.C. § 77j(b) (1988) (allowing Securities and Exchange Commission to suspend the use of a prospectus that contains a misstatement or omission of material fact)
 
 
 [6]
 The Defendants argue that these "requirements" were merely guidelines that did not rise to the level of internal policy. To support this position, the Defendants argue that Fairly testified that he only intended for the memorandum to contain guidelines and no other Buchanan & Company employee testified that this memorandum detailed mandatory requirements. The Government, however, argues that the memorandum does not contain the word "guidelines" but instead refers to "minimum requirements." Viewed in the light most favorable to the Government, we note that a jury would be entitled to infer that Fairly had the authority to issue this memorandum as the company's Executive Vice President, disregard Fairly's characterization of the memorandum, and give the language used in the memorandum its ordinary and natural meaning, thereby considering this memorandum to outline internal policy requirements
 
 
 [7]
 The debt service reserve fund is an amount of money set aside to provide operational funding for the period of time between the bond closing and the opening of the facility
 
 
 [8]
 During cross-examination, Fairly testified that the amount allocated was ninety percent of the amount he requested and that he saw nothing unreasonable about this amount. The amount allocated, however, was evidently insufficient because the marketing fund was depleted four months prior to Skylyn Hall's opening
 
 
 [9]
 The distinction between a marketing consultant and a marketing director was explained at trial by a Government witness, Ron Green. A marketing consultant could only make suggestions, which Smith was free to disregard. A marketing director, however, could take control of the marketing program and implement her plans
 
 
 [10]
 Neither Low nor Buchanan, however, verified that this information was correct by asking to view the pre-sale contracts
 
 
 [11]
 The $1,700,000 was split between Buchanan & Company and White Quick Printing, Buchanan's printing company which printed the Official Statement
 
 
 [12]
 The indictment also named Rev. C. Benjamin Smith and Horace C. Smith as co-defendants. Benjamin Smith entered a plea of no contest and Horace Smith entered a plea of guilty to the charges in the indictment before Stone and Buchanan's trial
 
 
 [13]
 The Government did not produce any witnesses or evidence on any of the dismissed charges
 
 
 [14]
 The indictment alleges that between May 30, 1985, and sometime in 1986, the Defendants directly and indirectly caused the marketing and sale of the Skylyn Hall bonds to prospective purchasers. Six purchasers testified as to their reliance on the Official Statement in their decision to invest in the bonds on the secondary market
 
 
 [15]
 The Defendants described the distinction between the primary and secondary markets as follows:
 The bonds were taken by Buchanan and Company and then sold on what we call the primary market to individual bond purchasers and/or other wholesale bond dealers. But by the end of 1985, that initial issue of bonds had been sold out by Buchanan and Company.
 Now, Your Honor, our definition of secondary market would be that once the bonds are initially sold to an individual or some entity, if those bonds are later sold back to Buchanan and Company under a buy-back provision that they have or are sold to some other entity, then that bond is negotiated, offered to the purchaser on the secondary market.
 (J.A. at 133.)
 
 
 [16]
 The plea agreement also prohibited prosecution for offenses that were based on the same act or transaction or constituted a part of a common scheme. Stone conceded at oral argument, however, that the offenses alleged in the Skylyn Hall indictment do not fall under these provisions. Therefore, if Stone is entitled to any relief, it must be because conspiracy, securities fraud, and mail fraud are of a "same or similar character" as filing a false cost report with a federal agency
 
 
 [17]
 The plea agreement does not reference the other offenses contained in the Medicaid fraud indictment
 
 
 [18]
 We also note that the affidavit submitted by Stone's former attorney refutes the interpretation that Stone urges. Specifically, Stone's attorney stated that at the time the plea agreement was entered his concern was that a conviction "could lead to [Stone] being debarred from further participation in the Medicaid Program and could lead to his inability to develop any healthcare facility which participated in that program." (J.A. at 75.)
 
 
 [19]
 The purchasers also testified that the bond, confirmation, and Official Statement arrived in the mail
 
 
 [20]
 More specifically, Buchanan argued that every witness testified that they had never seen track records disclosed. This is not correct. Thomas Snyder testified that while he had not previously seen an underwriter's track record disclosed, he had seen a developer's record disclosed. In addition, he brought to trial with him a portion of an Official Statement from one bond issue that disclosed the developer's track record
 
 
 [21]
 As noted in section I, Buchanan did not own part of Countryside Manor, but had loaned money to its operations in order to keep the project operating. Thus, if the project defaulted, Buchanan would lose his investment in the project
 
 
 [22]
 The Defendants cite Reed v. Philadelphia Transp. Co., 171 Pa.Super. 60, 90 A.2d 371, 372-73 (1952), for the proposition that a trial court abuses its discretion if it does not allow a party to inquire into the amount of compensation an opposing party's expert expects to receive for his testimony. Nothing in Greenwood or Tights indicates that this court would revoke the trial judge's discretion to limit cross-examination on an expert witness's compensation and we decline to impose such a restriction
 
 
 [23]
 The questioning surrounding this issue went as follows:
 Q Have you been paid any fees in this case, Mr. Snyder?
 A Yes, my company gets paid.
 Q All right, sir. And what arrangement do you have with the government regarding moneys paid to you for testifying today?
 A Okay, I'm a salary employee that works for Bankers Finance. And the arrangement with Bankers Finance for my absence of employment, and if you are familiar with Article 3, Section 40, when you perform duties outside the scope of your employer, those moneys go to Bankers Finance.
 Q All right, sir. My question is, what arrangement, did you make this arrangement with the government or did Bankers Finance make the arrangement?
 A I made that arrangement with the government.
 Q All right. My question is what arrangement did you make with the government regarding moneys to be paid for your testimony, regardless of who it is paid to?
 A Okay. I believe there is a contract, I don't know whether you call it a contract, a typical government form where they listed X number of days for review of documents, and X number of days for testimony, and there is an amount at the bottom and expenses.
 Q There is a document reflecting moneys that have been paid to you?
 A Well, nothing has been paid to me yet.
 Q There is a document that exists that reflects the agreement to pay you money?
 A Yes, sir.
 MR. SNEED: Your Honor, I would request that information. I thought that--
 THE COURT: He says he is being paid. That is all that is relevant. He is being paid to appear here as an expert witness, is being paid for his time to investigate, to review the documents. He is being compensated. Now, move on to something else.
 MR. SNEED: All right, sir. May I request the right to review that contract, Your Honor?
 THE COURT: You can review it at the break, move on to something else.
 MR. SNEED: All right, sir.
 (J.A. at 299-301.)