70 F.3d 113
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Anthony Augustas BENNETT, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
George BENNETT, Defendant-Appellant.
 Nos. 95-5048, 95-5089.
 United States Court of Appeals, Fourth Circuit.
 Submitted Oct. 31, 1995.
Decided Nov. 16, 1995.
 
 Appeals from the United States District Court for the Middle District of North Carolina, at Winston-Salem. William L. Osteen, Sr., District Judge. (CR-94-189).
 Gregory Davis, Assistant Federal Public Defender, Greensboro, North Carolina; David R. Crawford, CRAWFORD & WHITAKER, P.A., Winston-Salem, North Carolina, for Appellants. Walter C. Holton, Jr., United States Attorney, Benjamin H. White, Jr., Assistant United States Attorney, Greensboro, North Carolina, for Appellee.
 Before HALL, MURNAGHAN, and NIEMEYER, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 In these consolidated appeals, Anthony Bennett appeals the 240-month sentence he received following his guilty plea to conspiracy to distribute crack cocaine, 21 U.S.C.A. Sec. 846 (West Supp.1995) (Count One), and use of a firearm (a Taurus 9 mm pistol) in a drug trafficking crime, 18 U.S.C.A. Sec. 924(c) (West Supp.1995), 18 U.S.C. Sec. 2 (1988) (Count Nine). George Bennett appeals his conviction for the same offenses and his 310-month sentence. George Bennett claims that the evidence was insufficient to establish his guilt, and also alleges that the district court's supplemental jury instructions were reversible error. George further contests the decision to hold him responsible for a half-pound of crack. USSG Sec. 2D1.1.[1] Anthony challenges the district court's finding that he was responsible for a halfpound of crack and for an assault on a law enforcement officer. USSG Sec. 3A1.2(b). We affirm.
 
 
 2
 Between April and June 1994, state undercover officer Hayes Corbett made a series of crack purchases from Keith Fenton and Anthony Bennett which culminated in the arrest of Anthony Bennett and his brother, George, on June 22, 1994. Anthony pled guilty to conspiracy to distribute crack and to use of a firearm in a drug trafficking crime. George Bennett went to trial on the same charges and was convicted. Keith Fenton became a fugitive. The encounters between Corbett and the Bennetts are summarized as follows.
 
 
 3
 On April 27, Corbett called Fenton's cellular phone number, met Fenton and Anthony Bennett at a store, and bought 2.1 grams of crack from Fenton for $100. On April 28, Corbett bought 1.8 grams of crack from Fenton at a shopping center for $100. Anthony Bennett was with Fenton.
 
 
 4
 On May 10, Corbett bought 2 grams of crack from Fenton outside Fenton's apartment. He paid $100. On May 18, Anthony Bennett answered Fenton's cellular number, met Corbett and took him to a house on Harding Street which had been rented by George Bennett in February 1994. Corbett bought 2.2 grams of crack from Anthony for $100. Anthony told Corbett to come to Harding Street for crack in the future. On May 19, Corbett went to Harding Street. Fenton was outside; Anthony and George drove up together. Fenton asked if Corbett was ready to move up to larger amounts. They all went inside and Corbett bought 6.1 grams of crack from Anthony for $300. On May 25, Corbett bought 11.4 grams of crack from Anthony at Harding Street for $500. Anthony told Corbett he could handle any amount.
 
 
 5
 On June 8, Corbett went to Harding Street where he found Fenton, Anthony, George, and two other males in the house. After George and the two unknown males left, Corbett inquired about the price of one ounce of crack, then bought 15.1 grams of crack from Anthony for $600. On June 15, Corbett went to Harding Street and discussed buying a pound of crack with Fenton, the only person there. Fenton made a phone call and told Corbett the price for an pound would be $1200 an ounce. Later the same day, Corbett met Anthony, who said he could supply a pound of crack for $1000 an ounce at any time provided he had some notice. Corbett said he would call the following week.
 
 
 6
 On June 22, Corbett called Anthony from a Hardee's and said he was ready to do the business they had discussed the previous week.
 
 
 7
 Anthony and George came to the Hardee's together in a Nissan truck and they all drove to a car lot, supposedly to do the deal. At the car lot, Corbett told the Bennetts he had $20,000 and wanted a pound of crack. George questioned whether Corbett really wanted that much, but assured Corbett that he could handle that amount, and could get half a pound immediately for $10,000. Corbett said his boss wanted a pound. He showed the Bennetts $20,000 in cash which he had in the trunk of his Jeep Cherokee. The Bennetts then tried to persuade Corbett to come to Harding Street or to Anthony's residence, but Corbett refused.
 
 
 8
 They all drove to the parking lot of an animal hospital and talked again. Corbett said he would not go to a house because he was afraid of being robbed. Anthony said he did not have that much crack, but knew someone who did. However, he said it would look funny if he asked for that much at one time. The Bennetts asked Corbett to follow them to the house of the person who had the large quantity of crack. Corbett refused.
 
 
 9
 Next, they drove to a shopping center and parked. George got in Corbett's car to wait with him while Anthony drove away, ostensibly to get $20,000 worth of crack. A police surveillance officer observed that Anthony Bennett drove to another part of the parking lot, out of Corbett's sight, and parked. After about twenty minutes, a black van pulled into the space beside Corbett and the driver sat in the van for a few minutes, then made a phone call from a pay phone. George asked Corbett whether he knew the man. He then asked Corbett to drive around the parking lot, which Corbett did. When he returned to his original parking space, Corbett saw Anthony drive up behind him.
 
 
 10
 Corbett and George went to the passenger window of the truck. Corbett leaned in and asked to see the drugs. At the same time, he heard George say, "Hold it ... you are the man," and felt a gun at his head. George threatened to kill Corbett and tried to make him get into the truck, which Corbett resisted. Anthony opened the door of the truck while George continued to threaten Corbett, trying to push him into the truck. Backup officers then arrived and arrested the Bennetts.
 
 
 11
 The apartment where Anthony Bennett lived with his wife was subsequently searched. In the master bedroom, a bag was seized which contained 19.7 grams of crack and $7760 in cash, including $300 used by Corbett for the June 8th crack purchase. A handgun and a shotgun were also in the room.
 
 
 12
 At George's trial, defense counsel argued to the jury that George intended to rob Corbett of the $20,000 on June 22, but was not part of a drug conspiracy. During its deliberations, the jury sent out three questions:
 
 
 13
 (1) Does the presence of drug money (dollars for the purpose of purchasing drugs), at a meeting for the holder of the money to buy drugs from more than one person, constitute a drug conspiracy offense?
 
 
 14
 (2) Secondly, is it true if the drug purchaser intends to buy, but the alleged sellers have no intention to sell at that time (even though earlier sales had occurred)?
 
 
 15
 (3) Three, if the alleged sellers (more than one), only intended to rob the purchaser, would the robbery (if a firearm was used), constitute a drug conspiracy offense (distribution, and use of a firearm during distribution), as defined by the Court in Count 9?
 
 
 16
 George's attorney suggested that the district court respond to each question by answering "No." However, the district court expressed concern that the jury was confused about how to apply the law of conspiracy, and was focused too much on the actions of George and the undercover officer rather than a possible agreement between George and his co-defendants.
 
 
 17
 After discussion with counsel, the district court told the jury that the answer to Question Three was no, if they found that George's only intent was to rob.
 
 
 18
 With regard to Question One, the court again answered no, but only "if you limit yourself to the finding of those facts only.... It does not constitute a drug conspiracy offense for one to take money somewhere in an attempt to buy drugs." The court reminded the jury that there might be other facts which would assist them in finding whether George had been part of a conspiracy to distribute drugs.
 
 
 19
 The court answered Question Two by first reminding the jurors that the intention of the purchaser, an undercover officer, did not matter because they were determining whether George had agreed with the other defendants to distribute drugs. The court told them the answer was no, "if these are all the facts you find," but cautioned that there might be other evidence they would want to consider.
 
 
 20
 The court then told the jury, "[Y]ou are focusing in on the actual sales or the presence of parties at alleged sales to determine whether there was a conspiracy or not. That may aid you in determining whether there was a conspiracy, but that's not determinative of whether there was a conspiracy." The court finished by again instructing the jury on conspiracy. George was subsequently convicted of conspiracy and use of a firearm in a drug trafficking case.
 
 George Bennett's Conviction
 
 21
 George Bennett argues that there was insufficient evidence to convict him of Count One (the conspiracy) because there was no evidence that he participated in drug sales to Corbett before June 22, and because there was no evidence the Bennetts actually intended to sell crack to Corbett on June 22. Therefore, he contends that the evidence showed at most that George intended to rob Corbett. He maintains that if his argument is accepted, the Sec. 924(c) conviction cannot stand because he was charged with use of a firearm in a drug trafficking crime, not a crime of violence. We need not reach the second question because the evidence supports the conspiracy conviction.
 
 
 22
 A conviction must be affirmed if there is substantial evidence to support it. Glasser v. United States, 315 U.S. 60, 80 (1942). In applying this standard, evidence is construed "in the light most favorable to the government, assuming its credibility, drawing all favorable inferences from it, and taking into account all the evidence, however adduced." United States v. Giunta, 925 F.2d 758, 764 (4th Cir.1991). To sustain a conspiracy conviction, "the government must show, first, that a conspiracy existed; then, that the defendant had knowledge of the conspiracy; and finally, that the defendant voluntarily became a part of the conspiracy." United States v. Bell, 954 F.2d 232, 236 (4th Cir.1992). The evidence showed that Anthony regularly made crack sales in George's house and that George had been present when one sale took place. On June 22, both Anthony and George responded to Corbett's call, and both discussed the difficulty of providing a pound of crack, and the possibility of selling Corbett a half-pound instead. This evidence supports the jury's finding that George actively participated in the crack conspiracy.
 
 
 23
 George Bennett next argues that the district court went beyond what was necessary to answer the jurors' questions by suggesting that they should consider evidence apart from the events of June 22 to determine whether George was a participant in a drug conspiracy. As a result, he claims, the court's response was impermissible. The necessity, extent, and character of supplemental jury instructions are a matter within the discretion of the district court. United States v. Horton, 921 F.2d 540, 547 (4th Cir.1990), cert. denied, 501 U.S. 1234 (U.S.1991). An error requires reversal only if it is prejudicial in the context of the record as a whole; the standard of review is whether the instructions "fairly responded to the jury's questions without creating prejudice." United States v. United Medical & Surgical Supply Corp., 989 F.2d 1390, 1406-07 (4th Cir.1993).
 
 
 24
 We find that the district court was justifiably concerned that the jurors had not fully understood the instructions already given them. It responded "no" to the jury's questions as defense counsel had requested. Beyond that, its admonition to consider all the evidence and its reinstruction on the law of conspiracy did not create any prejudice to George Bennett. Therefore, the district court did not abuse its discretion in its supplemental instructions.
 
 George Bennett's Sentence
 
 25
 George Bennett argues that the district court erred in finding that he intended to sell Corbett a half-pound of crack on June 22 for two reasons. First, no sales near that amount had been made to Corbett previously and only 19.7 grams of crack were recovered from Anthony's apartment after the arrests. Second, neither defendant would have contemplated selling crack to a person believed to be a law enforcement officer.[2]
 
 
 26
 The district court found that George negotiated to sell Corbett half a pound and had both the intent and the ability to produce that amount because Anthony told Corbett he could get it from someone he knew. Further, the court found that the defendants became suspicious that Corbett might be a policemen during their negotiations. The initial intent to produce the negotiated amount was sufficient to make George accountable for that amount. USSG Sec. 2D1.1, comment. (n.12) (negotiated amount excluded only if defendant lacked both intent and ability to produce it); United States v. Brooks, 957 F.2d 1138, 1151 (4th Cir.), cert. denied, 60 U.S.L.W. 3879 (U.S.1992). The court's finding was not clearly erroneous.
 
 Anthony Bennett's Sentence
 
 27
 Anthony also argues that he lacked the intent and the ability to produce the negotiated half-pound of crack because previously he had sold much smaller quantities to Corbett and because he brought no crack to the meeting on June 22. At his sentencing hearing, the district court found that Anthony intended to sell Corbett a half-pound based on his previous sales to Corbett and his assurance to Corbett on June 15 that he could supply a pound. The court found, and the defense conceded, that the intent to sell a half-pound was sufficient for Anthony to be accountable for it, even if he lacked the ability to produce it.
 
 
 28
 Although it appears that Anthony became suspicious of Corbett during the June 22 meeting, the court's finding that he initially intended to sell a large amount of crack to Corbett is not clearly erroneous. Anthony sold crack to Corbett in ever-larger amounts in May and June. On June 22, after Corbett rejected a half-pound as too little, Anthony said he had a source who could supply a pound of crack. He was hesitant to request that much, and may have used the phone he had in his truck to ask someone to inspect Corbett. However, the court could find on the evidence that, before he became suspicious, Anthony intended to sell Corbett as much as a half-pound of crack.
 
 
 29
 Anthony contests the inclusion of the 19.7 grams of crack found on the bed in his apartment, and the conversion equivalent of the $7466 in cash found in the same bag. Except for the $300 in marked bills which Anthony had received for drugs which were separately counted as relevant conduct, the drugs and money found in Anthony's apartment were properly included to compute his base offense level. However, inclusion of these amounts did not change his offense level once he was properly held accountable for the half-pound of crack.
 
 
 30
 Last, Anthony challenges the sentencing adjustment made under guideline section 3A1.2(b) for assault on a law enforcement officer. Count Nine, the Sec. 924(c) charge to which Anthony pled guilty, specifically charged use of the Taurus 9 mm pistol which George used to threaten Corbett. Anthony admitted in a statement to the probation officer that he could reasonably foresee that George would be carrying a gun on June 22 because he often did. Corbett testified that, while George was threatening to kill him and trying to make him get into the Nissan truck, Anthony opened the door of the truck so that George could push him inside. On these facts, the enhancement for assault on a law enforcement officer was properly made in Anthony's case.
 
 
 31
 We therefore affirm George Bennett's convictions and sentence and Anthony Bennett's sentence. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.
 
 
 32
 AFFIRMED.
 
 
 
 [1]
 United States Sentencing Commission, Guidelines Manual (Nov.1994)
 
 
 [2]
 George Bennett's statement of issues identifies "reasonable foreseeability" as the issue. USSG Sec. 1B1.3(a)(1)(B). But his argument focuses on whether the half-pound negotiated was excludable under Application Note 12 to USSG Sec. 2D1.1