UNITED STATES of America, Appellee,

v.

William H. SEALS, a/k/a Puddin, a/k/a William Brooks, Appellant.

UNITED STATES of America, Appellee,

v.

Gary W. SWEATT, Appellant.

Nos. 96–3108, 96–3109.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 5, 1997.

Decided Dec. 5, 1997.

Daniel H. Bromberg, appointed by the court, Washington, DC, argued the cause for appellant William H. Seals.

Lisa K. Coleman, Washington, DC, argued the cause for appellant Gary W. Sweatt. John P. Dean, appointed by the court, was on brief.

Mary–Patrice Brown, Assistant United States Attorney, argued the cause for the appellee. Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Thomas J. Tourish, Jr., and G. Bradley Weinsheimer, Assistant United States Attorneys, Washington, DC, were on brief.

Before: WILLIAMS, GINSBURG and HENDERSON, Circuit Judges.

KAREN LeCRAFT HENDERSON, Circuit Judge:

The appellants, William Seals and Gary Sweatt, appeal their convictions on federal conspiracy, kidnapping and extortion charges. They contend that the Speedy Trial Act, 18 U.S.C. §§ 3161 *et seq.*, and Article III of the United States Constitution require dismissal of the indictment underlying their convictions. In addition, Sweatt argues that there was insufficient evidence to convict him of kidnapping and that the district court improperly sentenced him as a "career offender" under section 4B1.1 of the United States Sentencing Guidelines (Guidelines). We affirm the appellants' convictions but vacate Sweatt's sentence and remand to the district court to resentence him not as a career offender.

## I. BACKGROUND

On August 2, 1995 Seals and Sweatt were arrested and a criminal complaint was filed

against them in D.C. Superior Court, charging them with armed kidnapping in violation of D.C.Code Ann. §§ 22–2101, 22–3202 (1981 & Supp.1995). They were not, however, immediately indicted on these charges. After their arrest by Federal Bureau of Investigation (FBI) agents, the FBI and the D.C. Metropolitan Police Department continued their joint investigation into the kidnapping. The investigation resulted in the arrest of two other suspects and additional evidence which persuaded the United States Attorney to alter his tentative decision to lodge D.C. charges against them and to instead indict them on federal charges. As a result, on October 31, 1995 a D.C. Superior Court grand jury returned an indictment in the United States District Court for the District of Columbia.

Before trial Seals and Sweatt moved to dismiss the indictment on Speedy Trial Act and constitutional (Article III) grounds. The lower court denied the motion, finding that the United States Attorney had not sent "the case back to D.C. Superior Court ... for the purpose of gaining additional time for federal prosecution." Pre–Trial Mot. Tr. 225. It further held that the Congress, with plenary authority over the District of Columbia, validly authorized the D.C. Superior Court, an Article I tribunal, to supervise a grand jury that can indict for both D.C. and federal offenses. *Id.* at 201.

At the appellants' trial the Government presented evidence showing that Sweatt had assisted in detaining the kidnap victim and in retrieving the ransom money. There was no evidence, however, from which the jury could infer that Sweatt had either been present at or assisted in the abduction and transport of the victim across state lines. At the close of the Government's case, Sweatt moved for acquittal on the ground that he could not be found guilty of kidnapping unless he was shown to have participated in the abduction or transport of the victim across state lines. His motion was denied.

The district court charged the jury on the kidnapping and extortion counts of the indictment under three theories: (1) liability as a principal under 18 U.S.C. § 1201(a) (kidnapping) and 18 U.S.C. § 1951 (extortion); (2) liability as an aider and abettor under 18 U.S.C. § 2; and (3) liability as a *Pinkerton* co-conspirator (*Pinkerton v. United States,* 328 U.S. 640, 647–48, 66 S.Ct. 1180, 1184–85, 90 L.Ed. 1489 (1946)). The jury returned a general verdict, finding both Seals and Sweatt guilty of conspiracy, kidnapping and extortion. Seals and Sweatt were subsequently sentenced to identical, concurrent terms of imprisonment. They each received 60 months for conspiracy, 240 months for extortion and life imprisonment for kidnapping.

At sentencing, Sweatt argued that he should be sentenced under the November 1994 version of Chapter 4, Part B, of the Guidelines and that, according to the 1994 version, as modified by *United States v. Price,* 990 F.2d 1367 (D.C.Cir.1993), he did not have the requisite number of prior convictions to qualify as a career offender. The district court disagreed, concluding that the November 1994 and November 1995 versions of the Guidelines were substantially identical, the only difference being that the 1995 version of section 4B1.1 contained amended Background Commentary. Thus, the lower court ruled that Sweatt's prior convictions of robbery and attempted distribution of heroin required that he be sentenced as a career offender under both the 1994 and 1995 versions of section 4B1.1.[1]

## II. DISCUSSION

Despite the parties' contentions to the contrary, all of the appellants' claims involve the trial court's legal conclusions or its application of legal standards to the facts. Accordingly, we review their claims *de novo.* *See United States v. Abdul–Saboor,* 85 F.3d 664, 667 (D.C.Cir.1996).

---

1. If Sweatt had not been sentenced as a career offender under section 4B1.1, the maximum term of imprisonment he could have received for the kidnapping conviction would have been 235 months, reducing his term of imprisonment from life to 240 months—the longest of the concurrent sentences imposed.

### A.  Timeliness of Indictment

■ The Speedy Trial Act (STA) provides that "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges."  18 U.S.C. § 3161(b). The appellants contend that the clock began on the date of their August 1995 arrests and expired thirty days later in September 1995. They therefore argue that their October 1995 indictment should be dismissed as untimely pursuant to 18 U.S.C. § 3162(a)(1).[2]  We disagree.

In *United States v. Mills*, 964 F.2d 1186 (D.C.Cir.) (en banc), *cert. denied*, 506 U.S. 977, 113 S.Ct. 471, 121 L.Ed.2d 378 (1992), we determined that "[u]nder the most natural reading" of section 3161(b), "an arrest starts the clock only if it is 'in connection with' *federal* charges" and thus, "[i]f ... the arrest [is] accompanied by a complaint charging violations of the D.C. (not U.S.) Code, it [is] not 'in connection with' federal charges." 964 F.2d at 1189 (emphasis original).  Further, we concluded that the remedial provision for an untimely indictment, 18 U.S.C. § 3162(a)(1), "also suggests that the [STA] is triggered only by arrests that are accompanied by the filing of a *federal* complaint against the defendant."  *Id.* (emphasis original); *see also id.* at 1193 (Congress adopted "language in 3161(b) that *addresses solely federal complaints* and their attendant arrests") (emphasis added).  We therefore held that because the *Mills* defendants were initially charged with violations of the D.C.Code, the section 3161(b) clock did not start on their arrest dates and thus the federal indictments (returned, in one instance, one year after arrest) were not untimely. 964 F.2d at 1188–93.

Our *Mills* decision disposes of the appellants' STA claims.  Their August arrests, accompanied by the filing of D.C. charges only, cannot be deemed arrests "in connection with" federal charges and thus cannot start the STA clock.  Nonetheless, Seals and Sweatt invite us to fashion an exception to *Mills* for the "unusual" circumstances of this case which (in their view) consist of (1) the FBI's involvement in the arrests and its continuing role in the post-arrest investigation of the kidnapping, (2) the United States Attorney's "contemplation" of federal charges when they were arrested and charged with violations of the D.C.Code, (3) the alleged tentativeness of the U.S. Attorney's initial decision to bring D.C. rather than federal charges and (4) the identity of the prosecuting personnel.  We decline their invitation.

First, the fact that the FBI was actively involved in their August arrests does not make them arrests "in connection with" federal charges.  *See United States v. Gerald*, 5 F.3d 563, 566 (D.C.Cir.1993) (where arrest was followed by indictment for D.C.Code violations, fact that defendant arrested by federal law enforcement officer held not to trigger STA clock), *cert. denied*, 511 U.S. 1144, 114 S.Ct. 2168, 128 L.Ed.2d 890 (1994); *cf. Mills*, 964 F.2d at 1192 (recognizing "the now well-established principle that a state arrest does not start the clock *no matter how extensive the federal involvement in the original arrest*") (emphasis added).  Nor does the fact that the FBI actively participated in the post-arrest investigation make Seals's and Sweatt's August apprehension an arrest "in connection with" federal charges.  *See United States v. Iaquinta*, 674 F.2d 260, 262–69 (4th Cir.1982) (federal investigation undertaken after defendant's arrest and indictment on state charges and leading to discovery of additional evidence prompting federal indictment did not mean STA clock began on date of original arrest); *cf. Gerald*, 5 F.3d at 565

---

2.  This subsection provides:

    If, in the case of any individual against whom a complaint is filed charging such individual with an offense, no indictment or information is filed within the time limit required by section 3161(b) as extended by section 3161(h) of this chapter, such charge against that individual contained in such complaint shall be dismissed or otherwise dropped.  In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors:· the seriousness of the offense;  the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice.

18 U.S.C. § 3162(a)(1).

(STA clock not triggered by original arrest on D.C. charges even though prosecutor subsequently decided to seek federal indictment as result of postarrest review of defendant's criminal record and seriousness of D.C. charges); *United States v. Candelaria,* 704 F.2d 1129, 1130 (9th Cir.1983) (arrest by military police did not trigger STA clock despite subsequent FBI involvement).

Second, whether the prosecutor contemplated the filing of, or only tentatively decided not to bring, federal charges at the time of the appellants' arrests is irrelevant to deciding when the clock starts. *Cf. Iaquinta,* 674 F.2d at 269 (suggesting inappropriateness of probe into federal prosecutor's motives because prosecutor not required to file federal charges as soon as he has enough evidence to prosecute). At the very least, such an inquiry is proscribed by the long line of cases holding that a federal prosecution based on the same conduct as a failed state prosecution—and which is pursued in order to salvage the prosecution—is not prohibited by the STA because the state arrest does not start the STA clock. *See Mills,* 964 F.2d at 1189–90 (citing Second, Third, Fourth, Fifth, Seventh, Eighth and Ninth Circuit decisions for "the undisputed rule that a *state* arrest does not trigger the Speedy Trial Act's clock, even if the arrest is for conduct that is the basis of a subsequent indictment for a federal offense").

Nor do the decisions upon which the appellants purport to rely—e.g., *United States v. Benitez,* 34 F.3d 1489, 1494 (9th Cir.1994), *cert. denied,* 513 U.S. 1197, 115 S.Ct. 1268, 131 L.Ed.2d 146 (1995); *United States v. Cepeda–Luna,* 989 F.2d 353, 357 (9th Cir. 1993)—require a different result. The cases do not authorize a wide-ranging judicial inquiry into the prosecutor's motives or the finality of his decisionmaking processes. Rather, they merely carve out a narrow exception to prevent prosecutorial manipulation

of STA deadlines. The "ruse" exception is inapposite here because the court below expressly found that "there was no effort to manipulate the system to gain more time" (Pre–Trial Mot. Tr. 225) and the appellants do not contest the finding.

Third, as the Government properly notes, the fact that the same personnel were responsible for prosecuting Seals and Sweatt in the D.C. Superior Court and United States District Court does not transform their arrests on D.C. charges into arrests "in connection with" federal charges. *See Mills,* 964 F.2d at 1192–93 (rejecting claim that identity of non-federal and federal prosecutorial personnel triggers STA clock on date of arrest accompanied by filing of non-federal charges).

Fourth, we reject the appellants' other arguments—namely, that the STA's language, structure and purpose suggest that an arrest on D.C. charges merely establishes a "presumption" that the arrest does not trigger the STA clock and that the "presumption" is rebutted by the unique circumstances of this case. To the extent that the arguments have any merit, they are plainly foreclosed by *Mills. See* 964 F.2d at 1193 (section 3161(b) "addresses *solely federal complaints* and their attendant arrests") (emphasis added).[3]

## B. Constitutionality of Indictment

D.C.Code Ann. § 11–1916(a) (1981 & Supp. 1995) (section 1916(a)) provides that "[a] grand jury serving in the District of Columbia may take cognizance of all matters brought before it regardless of whether the indictment is returnable in the Federal or District of Columbia Courts." The appellants argue that the provision is unconstitutional because it vests the judicial power of the United States outside Article III and it

---

**3.** Thus, contrary to the appellants' argument, we decline to read section 3161(b) without reference to section 3162(a)(1) (*see supra* note 2). *See Mills,* 964 F.2d at 1189 ("There appears to be undisputed support among the circuits for this reading of the interplay between §§ 3161(b) and 3162(a)(1)."). Similarly, we reject their assertion that the STA clock should be understood to

start on the same date the Sixth Amendment clock starts. *See id.* at 1193 ("[T]he [STA] is not intended to track the Sixth Amendment. Within the set of cases covered, it establishes bright-line rules assuring minimum speed, while at the same time preserving defendants' Sixth Amendment claims in full.").

does so by improperly empowering the executive branch.[4]

### (1) Judicial Supervision of Grand Jury as "Judicial Power of United States"

■ The only reference to the grand jury in the Constitution is found in the first clause of the Fifth Amendment.[5] The grand jury "has not been textually assigned, therefore, to any of the branches described in the first three Articles." *United States v. Williams,* 504 U.S. 36, 47, 112 S.Ct. 1735, 1742, 118 L.Ed.2d 352 (1992).[6] Accordingly, it has been described as "an institution separate from the courts, over whose functioning the courts do not preside." *Id.; see also id.* at 48, 112 S.Ct. at 1742 ("[I]n its day-to-day functioning, the grand jury generally operates without the interference of a presiding judge."); *but cf. Blair v. United States,* 250 U.S. 273, 278, 39 S.Ct. 468, 470, 63 L.Ed. 979 (1919) ("At the foundation of our federal government the inquisitorial function of the grand jury and the compulsion of witnesses were recognized as incidents of the judicial power of the United States."); *Levine v. United States,* 362 U.S. 610, 617, 80 S.Ct. 1038, 1043, 4 L.Ed.2d 989 (1960) ("The grand

---

4. The appellants also claim that section 1916(a) deprives them of the constitutional safeguards associated with Article III supervision of federally-indicting grand juries. *See Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 848, 106 S.Ct. 3245, 3255, 92 L.Ed.2d 675 (1986) ("Article III, § 1, serves both to protect the role of the independent judiciary within the constitutional scheme of tripartite government, ... and to safeguard litigants' right to have claims decided before judges who are free from potential domination by other branches of government.... Although our cases have provided us with little occasion to discuss the nature or significance of the latter safeguard, our prior discussions of Article III, § 1's guarantee of an independent and impartial adjudication by the federal judiciary of matters within the judicial power of the United States intimated that this guarantee serves to protect primarily personal, rather than structural, interests.") (internal quotation marks and citations omitted); *Peretz v. United States,* 501 U.S. 923, 929, 111 S.Ct. 2661, 2665–66, 115 L.Ed.2d 808 (1991) (noting that *Gomez v. United States,* 490 U.S. 858, 864, 109 S.Ct. 2237, 2241–42, 104 L.Ed.2d 923 (1989), had construed statute to avoid "substantial question whether a defendant has a constitutional right to demand that an Article III judge preside at every critical stage of a felony trial"); *but cf. Palmore v. United States,* 411 U.S. 389, 400, 93 S.Ct. 1670, 1678, 36 L.Ed.2d 342 (1973) (rejecting view "that criminal offenses under the laws passed by Congress may not be prosecuted except in courts established pursuant to Art. III [because] [i]n our view, ... there is no support for this view in either constitutional text or in constitutional history and practice"); *Swain v. Pressley,* 430 U.S. 372, 382, 97 S.Ct. 1224, 1230, 51 L.Ed.2d 411 (1977) ("[T]he Constitution does not require that all persons charged with federal crimes be tried in Article III courts.").

To the extent this claim is distinguishable from the appellants' other claims, it implicates personal, not structural, constitutional rights—insofar as such rights might exist in the grand jury context (about which we express no opinion here). Assuming the right exists and assuming it was violated as alleged, the appellants would not be entitled to a dismissal of the indictment unless the violation prejudiced them, which they do not contend and which the trial judge explicitly rejected. *See Bank of Nova Scotia v. United States,* 487 U.S. 250, 254, 108 S.Ct. 2369, 2373, 101 L.Ed.2d 228 (1988) ("We hold that as a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants."). While *Bank of Nova Scotia* involved violations of Fed.R.Crim.P. 6(d) & (e), the decision plainly suggests that the analysis for constitutional errors is no different from that used to assess other types of errors. *See id.* at 256, 108 S.Ct. at 2374 ("It would be inappropriate to devise a rule permitting federal courts to deal more sternly with nonconstitutional errors than with constitutional errors."). Moreover, if the petit jury ultimately returns a guilty verdict, any error committed at the grand jury stage is (with exceptions not applicable here) nonprejudicial. *See United States v. Mechanik,* 475 U.S. 66, 70, 106 S.Ct. 938, 941–42, 89 L.Ed.2d 50 (1986) ("But the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.") (note omitted).

5. The Grand Jury Clause of the Fifth Amendment recites:

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger;....

U.S. Const. Am. V, cl. 1.

6. The grand jury's lineage is outlined in *Hurtado v. California,* 110 U.S. 516, 4 S.Ct. 111 (1884), and dates back to at least 1164. *Id.* at 529, 4 S.Ct. at 117–18.

jury is an arm of the court and its *in camera* proceedings constitute a judicial inquiry.") (internal quotation omitted).

The independence of the grand jury reflects the protective role it plays in our system of criminal justice: "Historically, this body has been regarded as the primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will." *Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962); *accord Williams*, 504 U.S. at 47, 112 S.Ct. at 1742.[7]

The grand jury does depend on the judiciary in its role as an investigative body: "A grand jury is clothed with great independence in many areas, but it remains an appendage of the court, powerless to perform its investigative function without the court's aid, because powerless itself to compel the testimony of witnesses." *Brown v. United States*, 359 U.S. 41, 49, 79 S.Ct. 539, 546, 3 L.Ed.2d 609 (1959), *overruled on other ground by Harris v. United States*, 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965); *accord United States v. Calandra*, 414 U.S. 338, 346 n. 4, 94 S.Ct. 613, 619, n. 4, 38 L.Ed.2d 561 (1974) ("[T]he grand jury must rely on the court to compel production of books, papers, documents, and the testimony of witnesses, and the court may quash or modify a subpoena on motion if compliance would be unreasonable or oppressive.") (internal quotation omitted). But even this dependence is limited as the grand jury must "remain 'free to pursue its investigations unhindered by external influence *or supervision* so long as it does not trench upon the legitimate rights of any witness called before

it.'" *Williams*, 504 U.S. at 48–49, 112 S.Ct. at 1743 (quoting *United States v. Dionisio*, 410 U.S. 1, 17–18, 93 S.Ct. 764, 773, 35 L.Ed.2d 67 (1973)) (emphasis added).

Moreover, an Article III judge's role in the grand jury's investigative process is often more attenuated as the responsibility for issuing subpoenas and for accepting returned indictments is vested in United States magistrate judges who are not Article III judges. *See* Fed.R.Crim.P. 17(a) (subpoenas "shall be issued by United States Magistrate Judge[s]"); Fed.R.Crim.P. 6(e)(4) & 6(f) (indictment is to be returned to magistrate judge). Indeed, the significance attached to Article III supervision of a grand jury is so minor that the Supreme Court has held that the judge's absence from the federal judicial district in which the grand jury is sitting neither implicates constitutional rights of the defendant nor otherwise constitutes cognizable error. *See Badders v. United States*, 240 U.S. 391, 394, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916). Therefore, "[g]iven the grand jury's operational separateness from its constituting court, it should come as no surprise that [the Supreme Court] ha[s] been reluctant to invoke the judicial supervisory power as a basis for prescribing modes of grand jury procedure." *Williams*, 504 U.S. at 49–50, 112 S.Ct. at 1743.

Accordingly, to the extent that the supervision of a federally competent grand jury implicates the Article III "judicial power of the United States," the power is a circumscribed one and is far removed from "the essential attributes of the judicial power" with which Article III is principally concerned. *Crowell v. Benson*, 285 U.S. 22, 51, 52 S.Ct. 285, 292, 76 L.Ed. 598 (1932). Moreover, section 1916(a) is applicable only to the "unique federal enclave," *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 75, 102 S.Ct. 2858, 2874, 73

---

**7.** Under the Fifth Amendment, an indictment is not required to initiate prosecution of a *state* "capital[ ] or otherwise infamous crime." *See Hurtado*, 110 U.S. at 538, 4 S.Ct. at 122. Although the District is treated like a state in many respects—*see, e.g., Palmore*, 411 U.S. at 397, 93 S.Ct. at 1676 (1973) (in District of Columbia "Congress may also exercise the police and regulatory powers which a state legislature or munic-

ipal government would have in legislating for state or local purposes")—the Supreme Court has held that the prosecution of a D.C.Code offense carrying the possibility of "infamous punishment" may not be commenced other than by grand jury indictment or presentment as required by the Fifth Amendment. *See United States v. Moreland*, 258 U.S. 433, 42 S.Ct. 368, 66 L.Ed. 700 (1922).

L.Ed.2d 598 (1982) (plurality op.) [hereinafter *Northern Pipeline*], that is the District of Columbia.

## (2) Expanded Executive Branch Involvement with Grand Jury as Encroachment on Judicial Branch

■ Seals and Sweatt contend that section 1916(a), by substituting Article I for Article III supervision of a federally-competent grand jury, unconstitutionally encroaches on the judicial branch. Their argument rests on the notion that a D.C. Superior Court judge, lacking life tenure and salary protections, is less able to curb federal prosecutorial abuses than his United States District Court counterpart. We think this notion is questionable at best. *See Palmore v. United States,* 411 U.S. 389, 402, 93 S.Ct. 1670, 1678, 36 L.Ed.2d 342 (1973) ("Nor, more particularly, has the enforcement of federal criminal law been deemed the exclusive province of federal Art. III courts. Very early in our history, Congress left the enforcement of selected federal criminal laws to state courts and to state court judges who did not enjoy the protections prescribed for federal judges in Art. III."); *cf. Testa v. Katt,* 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947) (Supremacy Clause required Rhode Island trial court to enforce non-penal provisions of federal penal price control statute). The delegation of certain Article III powers to United States magistrate judges, who are not Article III judges, has also been upheld. *See, e.g., Peretz v. United States,* 501 U.S. 923, 937, 111 S.Ct. 2661, 2669–70, 115 L.Ed.2d 808 (1991) (structural constitutional protection not abrogated by allowing magistrate to conduct *voir dire*); *United States v. Raddatz,* 447 U.S.

667, 683, 100 S.Ct. 2406, 2416, 65 L.Ed.2d 424 (1980) (delegation of suppression hearing to magistrate did not violate Article III or Due Process Clause so long as Article III court retained final authority). Moreover, the Supreme Court has held that a D.C. Superior Court judge is presumed competent to pass on federal constitutional questions that may arise in the course of a criminal trial. *See Swain v. Pressley,* 430 U.S. 372, 383, 97 S.Ct. 1224, 1230–31, 51 L.Ed.2d 411 (1977) ("[T]he judges of the Superior Court of the District of Columbia must be presumed competent to decide all issues, including constitutional issues, that routinely arise in the trial of criminal cases.").[8]

The appellants' challenge requires us to assess the "practical effect" of the alleged infringement of Article III power:

[I]n reviewing Article III challenges, we have weighed a number of factors, none of which has been deemed determinative, with an eye to *the practical effect that the congressional action will have on the constitutionally assigned role of the federal judiciary.* ... Among the factors upon which we have focused are [1] the extent to which the 'essential attributes of judicial power' are reserved to Article III courts, and, conversely, [2] the extent to which the non-Article III forum exercises the range of jurisdiction and powers normally vested only in Article III courts, [3] the origins and importance of the right to be adjudicated, and [4] the concerns that drove Congress to depart from the requirements of Article III.

*Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 851, 106 S.Ct. 3245, 3257, 92 L.Ed.2d 675 (1986) (emphasis add-

---

**8.** We do not here conclude that there are no constitutional limitations on the Congress's authority to delegate either grand jury supervisory functions or federal felony trial supervisory powers to state and Article I judges, as controlling precedent suggests that, in at least some instances, a non-consenting defendant may have a personal constitutional claim to *adjudication* by an Article III judge. *See Gomez v. United States,* 490 U.S. 858, 872 n. 25, 109 S.Ct. 2237, 2246, 104 L.Ed.2d 923 (1989); *Peretz,* 501 U.S. at 936, 111 S.Ct. at 2669 ("[I]t is arguable that a defendant in a criminal trial has the right to demand the presence of an Article III judge at voir dire."). Even if a defendant has such a constitu-

tional right to Article III *adjudication,* it is far from clear that he has a corresponding right to *indictment* under Article III supervision. Further, because the grand jury conducts its proceedings *ex parte,* it would be difficult (if not impossible) to obtain the accused's consent to non-Article III supervision without altering the fundamental and independent role of the grand jury in the investigative and indictment process—something *Williams* plainly proscribes. *See Williams,* 504 U.S. at 52–55, 112 S.Ct. at 1744–46 (rejecting judicial rule requiring presentation of exculpatory evidence to grand jury because it would "alter the grand jury's historical role").

ed). Applying the *Schor* test here, we conclude that section 1916(a) does not abrogate Article III structural protections.[9]

First, as discussed earlier, the power to supervise a federally-competent grand jury cannot fairly be described as an "essential attribute" of the "judicial power of the United States." The limited authority a supervising judge wields, the independence of the grand jury from both the judicial and executive branches, as well as the fact that such supervisory responsibilities are often discharged by a magistrate judge (without requiring the accused's consent)—all manifest that the supervisory power at issue is not an "essential attribute" of the "judicial power of the United States." *See generally Williams,* 504 U.S. at 47–55, 112 S.Ct. at 1742–46.

Second, even if supervision of a federally-competent grand jury qualified as an "essential attribute," section 1916(a) authorizes only a limited sharing of the supervisory power with an Article I court. An Article III judge continues to preside at the defendant's trial and retains his authority to dismiss an indictment. *Cf. Bank of Nova Scotia v. United States,* 487 U.S. 250, 254, 108 S.Ct. 2369, 2373, 101 L.Ed.2d 228 (1988) ("We hold that, as a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants."); *United States v. Raddatz,* 447 U.S. 667, 683, 100 S.Ct. 2406, 2416, 65 L.Ed.2d 424 (1980) (delegation of authority to conduct suppression hearing to magistrate judge "does not violate Article III so long as the ultimate [suppression] decision is made by the district court").

Third, while indictment or presentment by a grand jury is a right secured to felony defendants by the Fifth Amendment, the history and origins of the grand jury suggest that any constitutional right to have it supervised by an Article III judge is of much more recent vintage:

The grand jury is an English institution, brought to this country by the early colonists and incorporated into the Constitution by the Founders. There is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor. The basic purpose of the English grand jury was to provide a fair method for instituting criminal proceedings against persons believed to have committed crimes. Grand jurors were selected from the body of the people and their work was not hampered by rigid procedural or evidential rules. In fact, grand jurors could act on their own knowledge and were free to make their presentments or indictments on such information as they deemed satisfactory. Despite its broad power to institute criminal proceedings the grand jury grew in popular favor with the years. *It acquired an independence in England free from control by the Crown or judges.*

*Costello v. United States,* 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956) (emphasis added); *accord Hurtado v. California,* 110 U.S. 516, 530, 4 S.Ct. 111, 118 (1884) ("When we add to this that the primitive grand jury heard no witnesses in support of the truth of the charges to be preferred, but presented upon common fame and general suspicion, we shall be ready to acknowledge that it is better not to go too far back into antiquity for the best securities for our 'ancient liberties.'"). Thus, the grand jury's reliance on a judge for subpoenas, immunity orders and the like is a relatively recent development in the history of the institution, resulting, no doubt, from proscribing the jurors' reliance on personal knowledge of events in the vicinage to form their opinions. *Cf.* Edward J. Finley II, Note, *Ignorance as Bliss? The Historical Development of an American Rule on Juror Knowledge,* 1990 U. Chi. Legal F. 457, 468 (jurors' use of personal knowledge not prohibited by many states until end of nineteenth century); *see also*

---

9. While *Schor* addressed the constitutionality of the Commodity Futures Trade Commission's power to decide a state-law counterclaim in an administrative reparation proceeding, there is no reason that the structural constitutional analysis should be any different in the criminal context. *See, e.g., Mistretta v. United States,* 488 U.S. 361,

382–83, 109 S.Ct. 647, 660–61, 102 L.Ed.2d 714 (1989) (citing *Schor* in describing separation of powers analysis to be applied in determining constitutionality of grant of authority to Sentencing Commission to set mandatory minimum punishments for criminal violations of U.S.Code).

*Badders,* 240 U.S. at 394–95, 36 S.Ct. at 368 (1916) (finding no error, constitutional or otherwise, in district judge's absence from District during grand jury deliberation).

Fourth, section 1916(a) promotes efficiency resulting from the identity (both in composition and function) of the D.C. Superior Court grand jury and the federal grand jury:

> [G]rand jurors for both the District Court and the Superior Court are selected from the same pool of names, by the same jury commissioners, by use of the Superior Court computer, and pursuant to an identical method. Moreover the grand jurors in the two courts have identical qualifications and it is only by chance that a person may be selected to serve on one grand jury rather than the other. The grand jury procedure is virtually identical in both.

Hackney *v. United States,* 389 A.2d 1336, 1340 (D.C.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 95 (1979). In addition, the provision immediately following section 1916 directs:

> To the extent feasible, the Superior Court and the United States District Court shall consider the respective needs of each court in the qualification, selection, and service of jurors. Nothing in this chapter shall be construed to prevent such courts from entering into any agreement for sharing of resources and facilities (including automated data processing and hardware and software, forms, postage, and other resources).

D.C.Code Ann. § 11–1917 (1981 & Supp. 1995). Given the limited pool of potential jurors available to serve both the D.C. Superior Court and the United States District Court, it is hardly surprising that the Congress should vest a grand jury empaneled by either court with authority to return an indictment in the other or that judicial supervisory authority should be shared by the courts. *See Atkinson v. United States,* 295 A.2d 899, 901–02 (D.C.1972) (observing that

as of February 1971, grand jury sitting in one court could return indictment to other court). While the grand jury arrangement in the District of Columbia may be unique, "[o]ur constitutional principles of separated powers are not violated ... by mere anomaly or innovation." *Mistretta v. United States,* 488 U.S. 361, 385, 109 S.Ct. 647, 661, 102 L.Ed.2d 714 (1989).

The two cases Seals and Sweatt rely on do not suggest a different conclusion. They first cite *O'Donoghue v. United States,* 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1933), in which the Supreme Court upheld the classification of District of Columbia courts as Article III courts because (1) the Congress did not expressly denominate them Article I tribunals, (2) the Congress consistently treated them like other Article III courts, (3) it vested them with broad powers to determine matters under national laws and (4) they were the only courts to which District of Columbia residents could turn to protect their federal statutory rights. *See* 289 U.S. at 534–35, 544–49, 53 S.Ct. at 744–45, 748–50; *cf. Palmore,* 411 U.S. at 405–07, 93 S.Ct. at 1680–81 (*O'Donoghue* "[r]el[ied] heavily on congressional intent" to uphold D.C. courts as Article III courts). Some forty-one years later, after the Congress established separate Article I and Article III courts in the District of Columbia, the Supreme Court held that Article III did not prohibit the Congress from authorizing D.C. Superior Court judges to hear federal criminal cases brought under corresponding provisions of the D.C.Code. *Palmore,* 411 U.S. at 389, 93 S.Ct. at 1672. Accordingly, *O'Donoghue* offers the appellants no support for their challenge.

Second, the plurality opinion in *Northern Pipeline* does not support the appellants.[10] In that opinion, Justice Brennan likened the Congress's plenary Article I authority over the District of Columbia to its authority over

---

**10.** The precedential value of *Northern Pipeline,* which did not produce a majority opinion, has been subsequently weakened. *See Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 584, 105 S.Ct. 3325, 3334–35, 87 L.Ed.2d 409 (1985) ("The Court's holding in [*Northern Pipeline*] establishes only that Congress may not vest in· a non-Article III court the power to *adjudicate,*

render final judgment, and issue binding orders in a traditional contract *action arising under state law,* without the consent of the litigants, and subject only to ordinary appellate review.") (emphasis added); *cf. Fields v. Washington Metro. Area Transit Auth.,* 743 F.2d 890, 894 n. 10 (D.C.Cir.1984).

territorial matters pursuant to Article IV and, with three other justices, held that, with respect to such enclaves, "the general principle of independent adjudication commanded by Art. III *does not apply.*" 458 U.S. at 76, 102 S.Ct. at 2874 (emphasis added).

### (3) Other Considerations

The line of cases confirming the Congress's plenary authority over the District of Columbia pursuant to Article I, § 8, cl. 17, further fortifies our holding today.[11] In particular, *Palmore* recognizes that "[i]t is apparent that the power of Congress under Clause 17 permits it to legislate for the District in a manner with respect to subjects that would exceed its powers, or at least would be very unusual, in the context of national legislation enacted under other powers delegated to it under Art I...." 411 U.S. at 397–98, 93 S.Ct. at 1676. Subsequently, the plurality opinion in *Northern Pipeline* went even further in describing the extent of the Congress's plenary authority under Article I, § 8, cl. 17: "Congress' power over the District of Columbia *encompasses the full authority of the government,* and thus, necessarily, *the Executive and Judicial powers as well as the Legislative.*" 458 U.S. at 76, 102 S.Ct. at 2874 (emphasis added).

Moreover, we cannot find in the Fifth Amendment any basis for concern regarding the assignment of the grand jury supervisory function to a non-Article III judge. Instead, we conclude that if a D.C. Superior Court judge is competent, despite lacking life tenure and salary protections, to adjudicate a constitutional right as fundamental as that guaranteed by the writ of *habeas corpus*— see *Swain*, 430 U.S. at 383, 97 S.Ct. at 1230–31—we see no reason that the same judge cannot likewise protect whatever Fifth Amendment right the appellants might have to indictment by a federally-competent grand

jury supervised by an impartial and independent judge.

### C. Sweatt's Kidnapping Conviction

The federal kidnapping statute, in relevant part, provides:

Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, *when*—

(1) the person is willfully transported in interstate or foreign commerce;

(2) any such act against the person is done within the special maritime and territorial jurisdiction of the United States;

(3) any such act against the person is done within the special aircraft jurisdiction of the United States as defined in section 46501 of title 49;

(4) the person is a foreign official, an internationally protected person, or an official guest as those terms are defined in section 1116(b) of this title; or

(5) the person is among those officers and employees designated in section 1114 of this title and any such act against the person is done while the person is engaged in, or on account of, the performance of official duties;

shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

18 U.S.C. § 1201(a) (emphasis added). Sweatt contends that the word "when" as used in section 1201(a) means that the kidnapping ended after the victim was transported across state lines and before he became involved in holding the victim and retrieving the ransom.[12] He therefore reasons that he cannot be held criminally lia-

---

**11.** Article I, § 8, cl. 17, in relevant part provides:

[The Congress shall have Power] To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of the Congress, become the Seat of the Government of the United States....

**12.** According to the Government's evidence, Sweatt assisted in holding the victim in Maryland while the ransom demand was made and he and Seals traveled to the District of Columbia to pick up the ransom. *See* Trial Tr. 612–14, 619–20, 709–10, 1156, 1171. There was also evidence that a telephone call was placed to Sweatt shortly after the victim was abducted. *Id.* at 713–16.

ble as a principal, aider and abettor or *Pinkerton* co-conspirator under 18 U.S.C. § 1201(a). He is mistaken.

Sweatt's crabbed reading of section 1201(a) is contrary to the "natural meaning" of the term "when." *See United States v. Wells,* — U.S. ——, ——, 117 S.Ct. 921, 927, 137 L.Ed.2d 107 (1997) ("the first criterion in the interpretive hierarchy, a natural reading of the full text") (citing *United States v. American Trucking Ass'ns, Inc.,* 310 U.S. 534, 542–43, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940)). The term "when" is used in section 1201(a) not in its temporal sense—i.e., "at the time that"—but rather in its categorical sense—i.e., "in cases where." This is evident from the syntax and structure of the provision: the list of factors immediately following "when" describes activities the provision intends to forbid, not their chronology. Moreover, if "when" had the meaning Sweatt ascribes to it, the word "while" in subsection (5) of section 1201(a) would be superfluous—again, a disfavored construction. *See Montclair v. Ramsdell,* 107 U.S. 147, 152, 2 S.Ct. 391, 394–95, 27 L.Ed. 431 (1883) (courts should "give effect, if possible, to every clause and word of a statute"); *cf. Moskal v. United States,* 498 U.S. 103, 111, 111 S.Ct. 461, 466–67, 112 L.Ed.2d 449 (1990) (declining to read provision narrowly so as to "limit it to *instances of fraud* rather than the *class of fraud* encompassed by its language") (emphasis added); *Bell v. United States,* 462 U.S. 356, 362, 103 S.Ct. 2398, 2402, 76 L.Ed.2d 638 (1983) ("[F]ederal criminal statutes that are intended to fill a void in local law enforcement should be construed broadly.").

Other courts have held that, even though a violation of 18 U.S.C. § 1201(a) occurs when all of the essential elements of the offense have been satisfied, the crime of kidnapping *continues* while the victim remains held and a ransom sought. *See United States v. Denny–Shaffer,* 2 F.3d 999, 1018 (10th Cir.1993) ("The broad language of § 1201(a) defines a continuing offense."); *cf. United States v. Garcia,* 854 F.2d 340, 344 (9th Cir.1988) (federal kidnapping is continuing offense and therefore statute of limitations does not begin with transport of victim across state lines), *cert. denied,* 490 U.S. 1094, 109 S.Ct.

2439, 104 L.Ed.2d 995 (1989); *cf. also Grunewald v. United States,* 353 U.S. 391, 403, 77 S.Ct. 963, 974, 1 L.Ed.2d 931 (1957) ("Kidnapers in hiding, waiting for ransom, commit acts of concealment in furtherance of the objectives of the conspiracy itself, just as repainting a stolen car would be in furtherance of a conspiracy to steal; in both cases the successful accomplishment of the crime necessitates concealment.") (note omitted); *see also McElroy v. United States,* 455 U.S. 642, 654–56, 102 S.Ct. 1332, 1339–40, 71 L.Ed.2d 522 (1982) (rejecting, as contrary to statute's purpose of aiding in apprehension of criminals who misuse channels of interstate commerce, argument that federal forgery conviction must be overturned because prosecutor had failed to establish instrument was forged before transport across state lines); *United States v. Toledo,* 985 F.2d 1462, 1467 (10th Cir.) (in enacting section 1201(a) "Congress was attempting to address the misuse of interstate commerce by kidnappers to frustrate the efforts of state police"), *cert. denied,* 510 U.S. 878, 114 S.Ct. 218, 126 L.Ed.2d 174 (1993). Accordingly, there was sufficient evidence to convict Sweatt as at least an aider and abettor—which is all that is required to sustain his conviction. *See Griffin v. United States,* 502 U.S. 46, 49, 112 S.Ct. 466, 469, 116 L.Ed.2d 371 (1991) ("[A] general jury verdict [is] valid so long as it [is] legally supportable on one of the submitted grounds. . . .").

Nor do the cases Sweatt cites compel a different conclusion. The cases hold only that unlawful abduction and transport across state lines is *sufficient* to violate section 1201(a); they do not hold, nor does it follow from their holdings, that the kidnapping concludes once the abduction and transport occur. *See, e.g., United States v. Broadwell,* 870 F.2d 594, 601 & n. 16 (11th Cir.) (holding that unlawful restraint began when victim was abducted and "continued" after he was transported across state lines even though crime "complete" upon transport), *cert. denied,* 493 U.S. 840, 110 S.Ct. 125, 107 L.Ed.2d 85 (1989). Accordingly, we uphold Sweatt's conviction on the kidnapping

charge.[13]

### D. Sweatt as "Career Offender" Under Section 4B1.1

■ We held in *United States v. Price*, 990 F.2d 1367 (D.C.Cir.1993), that "the Sentencing Commission adopted §§ 4B1.1 & 4B1.2 solely in an effort to fulfill the mandate of 28 U.S.C. § 994(h)" and therefore only those offenses specified in section 994(h) can render the defendant a "career offender." 990 F.2d at 1368. Because aiding and abetting, conspiring and attempting to commit certain narcotics offenses are not among those offenses listed in section 994(h), we held that the defendant could not be sentenced as a career offender on the basis of prior convictions of those offenses. *Id.* *Price* concluded that Application Note 1 to section 4B1.2 of the Guidelines was invalid to the extent it suggested that convictions of certain inchoate offenses counted in treating the defendant as a career offender. *Id.* We held open the question, however, whether the Sentencing Commission could repromulgate Application Note 1 pursuant to statutory authority other than section 994(h), including its discretionary authority under section 994(a). *See id.* at 1370 ("Thus, without passing on the Commission's authority to re-adopt Application Note 1 to § 4B1.2 (or some variation of Note 1) on alternative grounds, we vacate the sentence and remand the case to the district court for resentencing.").

The Commission responded by amending and repromulgating the Background Commentary to section 4B1.1 of the Guidelines. The repromulgated version clarified that, pursuant to the Commission's general statutory authority, 28 U.S.C. § 994(a)-(f), and its amendment authority, 28 U.S.C. § 994(o)-(p), prior convictions that can count toward career offender status include convictions of attempts, aiding and abetting and other inchoate offenses. *See* 1995 Guidelines Manual, App. C, Am. 528 at 434–35. The repromulgated Background Commentary to section 4B1.1 became effective on November 1, 1995.

Sweatt argues that in light of *Price*, the district court improperly sentenced him as a career offender under the repromulgated version of section 4B1.1 because his 1987 conviction of attempted distribution of heroin could not be used under the November 1994 version of section 4B1.1—the version in effect when he committed the crimes.[14] By retroactively applying the November 1995 version of section 4B1.1, he reasons, the trial court imposed a greater punishment than it could have imposed under the law as it existed when the crimes were committed, violating the *Ex Post Facto* Clause. *See, e.g., United States v. Stover*, 93 F.3d 1379, 1386 (8th Cir.1996); *United States v. Smallwood*, 35 F.3d 414, 417–18 n. 18 (9th Cir.1994); *United States v. Saucedo*, 950 F.2d 1508, 1515 (10th Cir.1991).

■ The Government essentially concedes that Sweatt's reading of *Price* is correct but it contends that we should overrule *Price*. *See* Appellee Br. at 43. Nevertheless, the law is well settled that one panel may not "overrule the decision of another panel of this court." *United States v. Doe*, 730 F.2d 1529, 1531 n. 2 (D.C.Cir.1984). Accordingly, we vacate Sweatt's sentence as a career offender pursuant to section 4B1.1 of the Guidelines and remand to the district court for resentencing. *See supra* note 1.

### III. CONCLUSION

For the foregoing reasons, we affirm the appellants' convictions. We vacate appellant

---

**13.** We express no opinion regarding the Government's and Sweatt's opposing arguments as to his culpability on a *Pinkerton* theory. We also note that although the trial court's charge, in describing the elements of kidnapping required to convict Seals and Sweatt as principals, declared that Sweatt could not be convicted unless he was shown to have participated in the abduction or transport of the victim across state lines (Trial Tr.1926), the aiding and abetting charge (*id.* at 1917–19) contained no such limitation and could have been used by a reasonable jury to convict Sweatt of kidnapping. *See Griffin*, 502

U.S. at 49, 112 S.Ct. at 469. In any event, although we need not reach the issue today, we doubt that a criminal defendant can obtain reversal of his conviction solely on the basis of instructions that create erroneous and unnecessary impediments to conviction. *See United States v. Bomski*, 125 F.3d 1115, 1116 (7th Cir.1997).

**14.** Sweatt does not dispute that his 1987 robbery conviction was properly counted as a prior conviction under section 4B1.1.

Sweatt's sentence as a career offender and remand for resentencing in accordance with the terms of this opinion.

*So ordered.*