Rehearing en banc granted by order
filed 1/14/03; opinion filed 9/30/02
is vacated

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
　　*Plaintiff-Appellee,*

　　v.　　　　　　　　　　　　　　No. 01-4463

DAVID B. PASQUANTINO,
　　*Defendant-Appellant.*

UNITED STATES OF AMERICA,
　　*Plaintiff-Appellee,*

　　v.　　　　　　　　　　　　　　No. 01-4464

CARL J. PASQUANTINO,
　　*Defendant-Appellant.*

UNITED STATES OF AMERICA,
　　*Plaintiff-Appellee,*

　　v.　　　　　　　　　　　　　　No. 01-4465

ARTHUR HILTS, a/k/a Butch,
　　*Defendant-Appellant.*

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(CR-00-202-JFM)

Argued: April 5, 2002

Decided: September 30, 2002

Before GREGORY, Circuit Judge, HAMILTON,
Senior Circuit Judge, and Gerald Bruce LEE,
United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Reversed by published opinion. Judge Gregory wrote the majority opinion, in which Judge Lee joined. Senior Judge Hamilton wrote a dissenting opinion.

_____

## COUNSEL

**ARGUED:** Bruce Robert Bryan, Syracuse, New York, for Appellant Carl Pasquantino; Jensen Egerton Barber, JENSEN E. BARBER & ASSOCIATES, Washington, D.C., for Appellant David Pasquantino; Isaac Joe, Jr., Baltimore, Maryland, for Appellant Hilts. Gregory Welsh, First Assistant United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Michael J. McCarthy, Bowie, Maryland, for Appellant Carl Pasquantino. Thomas M. DiBiagio, United States Attorney, Baltimore, Maryland, for Appellee.

_____

## OPINION

GREGORY, Circuit Judge:

Appellants were indicted and convicted of engaging in a scheme to defraud the governments of Canada and the Province of Ontario of excise duties and tax revenues applicable to the importation and sale of liquor. They assert that the district court erred in denying their pre-trial motion to dismiss the indictment because a scheme to defraud a foreign government of duties and taxes is not cognizable under the wire fraud statute, 18 U.S.C. § 1343.[1] We agree with this assertion, and for the reasons that follow, we reverse appellants' convictions.

_____

[1] Appellants also contend that their motion for judgment of acquittal should have been granted because the evidence presented at trial was

2

## I.

Years ago, after Canada increased the sin taxes on alcohol and cigarettes to such a level that Canada's taxes greatly exceeded comparable United States taxes, a Canadian black market for such goods emerged. Capitalizing on this situation, appellants David and Carl Pasquantino, residents of Niagara Falls, New York, developed a scheme where, with the help of drivers such as appellant Arthur Hilts, they would purchase large quantities of low-end liquor from discount liquor stores in Maryland, transport the liquor to New York, store it there, and then smuggle the liquor into Canada in the trunks of cars. While all applicable Maryland and federal taxes were paid on the liquor, there is no evidence that any Canadian taxes or duties were ever paid on the liquor that was transported into Canada. The enterprise began in 1996 and continued through May 2000.

The Bureau of Alcohol, Tobacco and Firearms (BATF) was alerted to the scheme after agents, routinely tracking Maryland liquor purchases, discovered that eight retail liquor stores in Maryland were buying unusually large quantities of lower cost liquors from wholesalers. A criminal investigation ensued, with two of the store owners cooperating proactively with investigating agents.[2] These store owners recorded telephone conversations, and advised agents of calls and visits from appellants.

BATF agents obtained numerous telephone, truck rental, and motel records, all of which evidenced the scheme.[3] Border crossings were

---

insufficient to support a wire fraud conviction. Appellant Hilts further argues that if the conviction is upheld, he is entitled to a new sentencing because the district court failed to make a determination as to the scope of his jointly undertaken criminal activity. Because we resolve this case on appellants' first contention, that the indictment should have been dismissed, we need not address these secondary arguments.

[2] In exchange for their cooperation, the store owners were not prosecuted for violations of U.S. Department of Treasury Regulations that they record and report bulk sales of alcohol.

[3] David and Carl Pasquantino made numerous interstate telephone calls from Niagara Falls, New York to Hagerstown, Maryland in order to place large liquor orders with the discount stores in Maryland.

monitored electronically, tracking license plates of vehicles entering Canada. Several vehicles, registered to drivers involved in the scheme, failed to stop for a second inspection when requested. BATF and Royal Canadian Mounted Police also conducted surveillance on David and Carl Pasquantino and their associates loading liquor in Maryland and unloading it in Canada after it was smuggled through customs. Marked bottles of liquor were recovered in Canada.

Appellants were indicted, along with four other individuals, on six counts of wire fraud, in violation of 18 U.S.C. § 1343.[4] They filed a motion to dismiss the indictment on the ground that the district court lacked subject matter jurisdiction, arguing that a scheme to defraud a foreign government of tax revenues is not cognizable under the wire fraud statute. The district court denied the motion and the case proceeded to jury trial.

At trial, the eight Maryland liquor store owners testified for the government about their dealings with the Pasquantinos. In addition to the store owners, two men who had been involved in the scheme testified that they transported liquor for David and Carl Pasquantino from the United States into Canada, and that the Pasquantinos paid them cash for each run. Canada Customs intelligence officer Gina Jonah testified that there is a Canadian federal excise tax and general sales tax, as well as a Liquor Control Board of Ontario tax and a provincial sales tax on liquor imported from the United States into Canada. J.A. 177-78. Officer Jonah, a seventeen-year employee with Canada Customs, explained that the equivalent of approximately $100 in United States currency would be due and owing on a case of liquor that was purchased in the United States and imported into Canada. She stated that generally the amount of Canadian tax due is twice the purchase price of the case of liquor in the United States.

David and Carl Pasquantino were convicted on all six counts of the indictment and sentenced to 57 months imprisonment on each count, to be served concurrently. Before the case was submitted to the jury, the district court dismissed all but Count I against Arthur Hilts. Hilts

---

[4] They were also indicted in Canada for failure to file excise taxes and possession of unlawfully imported spirits, though the status and disposition of the Canadian charges is not evident in the record provided to us.

4

was convicted on that count and sentenced to 21 months. This appeal followed.

## II.

The threshold question here involves whether a scheme to evade the taxes of another country can be prosecuted as wire fraud by the United States government. Appellants argue that the trial court erred in denying their motion to dismiss the indictment. When reviewing the denial of a motion to dismiss an indictment, this Court reviews the district court's factual findings for clear error and its legal conclusions *de novo*. *See United States v. Ward*, 171 F.3d 188, 193 (4th Cir. 1999). Because the issue involves a pure question of law, whether the scheme alleged in the indictment is cognizable under the wire fraud statute, our review here is *de novo*. *See United States v. United Medical and Surgical Supply Co.*, 989 F.2d 1390, 1398 (4th Cir. 1993).

## III.

Wire fraud requires proof of 1) a scheme to defraud, and 2) the use of a wire communication in furtherance of that scheme.[5] *See United States v. Bollin*, 264 F.3d 391, 407 (4th Cir. 2001). The Supreme Court has been clear that the mail and wire fraud statutes are limited in scope to schemes aimed at causing deprivation of money or property. *See McNally v. United States*, 483 U.S. 350 (1987). Appellants argue that 1) Canada's tax revenues do not qualify as "property" within the scope of the wire fraud statute, and 2) the prosecution is barred by the principles underlying the common law revenue rule.

---

[5] At the time of the offense, the wire fraud statute provided:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both . . . .

18 U.S.C. § 1343 (2000).

A.

Appellants first argue that under the Supreme Court's recent decision in *Cleveland v. United States*, 531 U.S. 12 (2000), Canada's right to collect taxes and duties is not a property right for purposes of the wire fraud statute. Appellants point to language from *Cleveland*, where the Court explains, "[i]t does not suffice, we clarify, that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim."[6] *Cleveland*, 531 U.S. at 15. Appellants' reliance on this statement evinces a misunderstanding of *Cleveland*. In *Cleveland*, the Court held that an unissued video poker license held by a state did not constitute property. *Id.* at 20. Though the license becomes the property of the licensee (the recipient) after it is issued, a government regulator does not part with property when it issues a license. *Id.* In other words, the license in *Cleveland* was *never* capable of being property in the hands of the *victim*. On the other hand, it is well established that "property" may comprise both tangible and intangible property rights, *see Carpenter v. United States*, 484 U.S. 19, 25 (1987), and that a government has a property right in tax revenues when they accrue, *see Manning v. Seeley Tube & Box Co.*, 338 U.S. 561, 566 (1950). *Cleveland* does not say otherwise. Indeed, *Cleveland* recognized that the government "nowhere allege[d] that Cleveland defrauded the State of any money to which the state was entitled by law." *Cleveland*, 531 U.S. at 22. Here, it was alleged that Canada was defrauded of tax revenues it was entitled to by law.[7] Can-

---

[6] Because the mail and wire fraud statutes share the same language in relevant part, we apply the same analysis to both offenses. *Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987).

[7] The alleged purpose of appellants' scheme was to defraud Canada of tax revenue. Though Canada's interest would not vest until appellants crossed the border, the fact remains that when the scheme came to fruition, if the appellants succeeded in completing border crossings without paying the duties (which they did here), Canada would be deprived of revenues. The tax debt would be property in Canada's hands. Because success of the scheme is irrelevant, *see Durland v. United States*, 161 U.S. 306, 315 (1896), the inquiry is whether, if the scheme succeeded, the victim here, the government of Canada, would have been deprived of something in which it held a property right. Here, it would have.

ada's right to collect taxes is therefore a sufficient property right for wire fraud purposes, unaffected by the Court's decision in *Cleveland*.

B.

Though Canada's right to collect taxes is a property right for *Cleveland* purposes, determination of whether Canada was actually or would have been *entitled to the tax revenues* involves an inquiry into the validity and operation of a foreign revenue law. We find that the principles underlying the revenue rule bar such an inquiry, and therefore bar appellants' prosecution in this case. Whether the revenue rule is applicable in wire fraud prosecutions is an issue of first impression in our circuit. Though we have not before considered the issue, two of our sister circuits have done so, and have reached dramatically different conclusions. The First Circuit, in *United States v. Boots*, 80 F.3d 580 (1st Cir. 1996), dismissed a similar indictment, while the Second Circuit has upheld convictions for schemes to defraud a foreign government of tax revenues, *United States v. Trapilo*, 130 F.3d 457 (2d Cir. 1997). As evidenced by the split in authority, this issue presents a difficult question indeed. However, after careful review, we agree with the First Circuit that a scheme to defraud a foreign government of tax revenues is not cognizable under the wire fraud statute. The indictment against appellants should have been dismissed by the district court.

In *Boots*, the defendants took part in a scheme to transport tobacco from a Native American reservation in upstate New York into New Brunswick, Canada, without paying taxes and excise duties on the tobacco. *Id.* at 583. To bypass customs checkpoints, the tobacco was transported surreptitiously into Canada through another reservation in Maine. *Id.* The defendants were charged with and found guilty of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371 and § 1343. *Id.* at 584. The First Circuit reversed the convictions, basing its decision primarily on the revenue rule. *Id.* The Court explained that the "rationale of the revenue rule has been said to be that revenue laws are positive rather than moral law; they directly affect the public order of another country and hence should not be subject to judicial scrutiny by American courts; and for our courts effectively to pass on such laws raises issues of foreign relations which are assigned to and

better handled by the legislative and executive branches of government." *Id.*

The First Circuit further explained:

> [t]he scheme to defraud at issue—proof of which is essential to conviction—had as its sole object the violation of Canadian revenue laws. To convict therefore, the district court and this court must determine whether a violation of Canadian tax laws was intended and, to the extent implemented, occurred. In so ruling, our courts would have to pass on defendants' challenges to such laws and any claims not to have violated or intended to violate them. *Where a domestic court is effectively passing on the validity and operation of the revenue rules of a foreign country*, the important concerns underlying the revenue rule are implicated.

*Id.* (emphasis added). Of "particular concern" to the First Circuit was "the principle of noninterference by the federal courts in the legislative and executive branches' exercise of their foreign policymaking powers." *Id.* at 587-88.[8]

We agree with the First Circuit. When the United States attempts to punish a crime whose sole objective is the violation of another country's revenue laws, the "important concerns underlying the reve-

---

[8] In addition to the revenue rule, the First Circuit also noted that the federal statute criminalizing the smuggling of goods into foreign countries punishes smuggling only if the foreign government has a reciprocal law. *Boots*, 80 F.3d at 588; *see* 18 U.S.C. § 546. It opined that a decision to uphold the wire fraud convictions "would have the effect of licensing prosecutions against persons who use the wires to engage in smuggling schemes against foreign governments irrespective of whether a particular government had the reciprocal arrangement called for in section 546." *Id.* "Effect cannot be given to section 1343 in these conditions without threatening the reciprocity provision of section 546, and offending generally the salutary principles underlying the revenue rule." *Id.* The Court then found its conclusion further supported by the "rule of lenity," stating that if Congress "had meant to authorize the courts to enforce this kind of application of the wire fraud statute, `it must speak more clearly than it has.'" *Id.* (citing *McNally v. United States*, 483 U.S. 350, 360 (1987)).

8

nue rule" are indeed implicated. *Boots*, 80 F.3d at 587. Though this case "does not require us to enforce a foreign tax judgment as such, upholding [appellants'] section 1343 conviction would amount functionally to penal enforcement of Canadian customs and tax laws." *Id.*

The revenue rule is a "longstanding common law doctrine providing that courts of one sovereign will not enforce final tax judgments or unadjudicated tax claims of other sovereigns." *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 109 (2d Cir. 2001) (providing a detailed history of the revenue rule). As the Supreme Court has recognized, many courts in the United States have adhered to the principle that a court need not give effect to the penal or revenue laws of foreign countries. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 413-14 (1964). In this case, the act of smuggling liquor into Canada to avoid import taxes is deplorable. The appellants' scheme was a money-making one, with the governments of Canada and Ontario as the victims. However, the fact remains that this prosecution involves Canada's tax laws. As the Second Circuit recently explained:

> [t]ax laws embody a sovereign's political will. They create property rights and affect each individual's relationship to his or her sovereign. They mirror the moral and social sensibilities of a society. Sales taxes, for example, may enforce political and moral judgments about certain products. Import and export taxes may reflect a country's ideological leanings and the political goals of its commercial relationships with other nations.

*R.J. Reynolds*, 268 F.3d at 111. We believe that there are essentially two reasons the revenue rule acts to bar wire fraud prosecutions for schemes to violate foreign tax laws.

First, we are of the opinion that "[n]o court ought to undertake an inquiry which it cannot prosecute without determining whether those laws are consonant with its own notions of what is proper." *Moore v. Mitchell*, 30 F.2d 600, 604 (2d Cir. 1929) (Hand, J., concurring). Expansion of the mail and wire fraud statutes to reach violations of foreign tax laws "risks turning federal prosecutors and investigators into de facto criminal law enforcement agents for [certain] foreign tax

9

authorities." Kathryn Keneally, *The U.S. Prosecutes Foreign Tax Evasion as a Domestic Crime—With Far Reaching Consequences*, 88 J. Tax'n 224, 229 (April 1998). The revenue rule allows our courts to avoid becoming ensnared in the difficult decisions concerning which foreign tax laws we, through criminal prosecutions here, will help to enforce.[9] The revenue rule should not be viewed as a means for guilty defendants to escape punishment, but rather it should be seen as an important protection mechanism for our courts.

Second, the revenue rule allows our courts to avoid interpreting and applying foreign tax laws. The government, arguing that interpretation of foreign laws is not needed here, relies on the Second Circuit's decision in *Trapilo*, 130 F.3d 457 (2d Cir. 1997), which categorically rejected the *Boots* decision. We find *Trapilo*'s rationale to be flawed.[10] In its rejection of *Boots*, the Second Circuit explained

---

[9] In a wire fraud prosecution such as this, where the violation of foreign taxes is at issue, a decision will always have to be made regarding whether or not to prosecute. In the case at hand, the decision was probably an easy one, given 1) the United States' good relations with Canada, and 2) the fact that a tax on liquor is generally thought by most to be acceptable. Imagine, however, that appellants had engaged in a similar scheme to travel overseas and defraud Afganistan or Iraq of tax revenues. Must the United States also prosecute such similar schemes? Where do we draw the line as to which countries' laws we will help enforce? Furthermore, imagine that Canada imposed an import duty on bibles, and appellants schemed to smuggle bibles rather than liquor. The revenue rule was created in part to avoid these types of political and foreign policy-based determinations. If we were to uphold appellants' convictions, our actions would at most run afoul of the principles underlying the revenue rule and at least encourage selective prosecution.

[10] In *Trapilo*, the defendants were charged in a one count indictment with money laundering conspiracy in violation of 18 U.S.C. § 1956(a)(1)-(2) and (h). Reversing the district court's dismissal of the indictment, the Second Circuit found that the language of the wire fraud statute unambiguously prohibits the use of interstate or foreign communication systems by anyone who intends to "devise *any* scheme or artifice to defraud." *Trapilo*, 130 F.3d at 551 (emphasis in original). The Court noted that the statute neither expressly, nor impliedly, precludes the prosecution of a scheme to defraud a foreign government of tax revenue. *Id.*

10

that under the wire fraud statute, what is proscribed is the use of the wires "in furtherance of a scheme whereby one *intends* to defraud another of property. Nothing more is required. The identity and location of the victim, and the success of the scheme, are irrelevant." *Id.* at 552 (emphasis added).[11] The Court stated that "the common law revenue rule, inapplicable to the instant case, provides no justification for departing from the plain meaning of the statute," because "[a]t the heart of this indictment is the misuse of the wires in furtherance of a scheme to defraud the Canadian government of tax revenue, *not the validity of a foreign sovereign's revenue laws*."[12] *Trapilo*, 130 F.3d at 551-52 (emphasis added).

Generally, we would agree that the identity and location of the victim in a wire fraud case are irrelevant. However, when that victim is a foreign government, that identity takes on a new importance. Here, in order to determine whether Canada was deprived of property (tax revenues), a determination must be made into whether Canada's tax laws were in fact broken, or were *intended* to be broken. The Second Circuit opined that the validity of Canada's revenue laws is not an issue. Rather, it has found that all that is necessary to prosecute a defendant for wire fraud in the United States is evidence that Canada imposes a duty on imported liquor, i.e., evidence of the *existence* of a foreign tax or duty. *United States v. Pierce*, 224 F.3d 158, 166 (2d Cir. 2000). But recognizing the *existence* of a law is inherently and inescapably tied to recognizing the *validity* and *scope* of that law. Certainly, prosecuting a defendant for violations of a law, or for attempting to violate that law, requires an inquiry into the applicability and validity of the law.

---

[11] The Court explained that the "intent to defraud does not hinge on whether or not defendants were successful in violating Canadian revenue law, as `[s]ection 1341 [as well as § 1343] punishes the *scheme*, not its success.'" *Trapilo*, 130 F.3d at 552 (citing *United States v. Helmsley*, 941 F.2d 71, 94 (2d Cir. 1991)).

[12] Though the Second Circuit has refused to apply the revenue rule in criminal wire fraud prosecutions, it has recognized the validity of the rule, and in fact used it to bar a civil RICO claim brought by the Attorney General of Canada to recover damages for lost tax revenues. *R.J. Reynolds*, 268 F.3d 103 (2d Cir. 2001). Unlike the *R.J. Reynolds* majority, we see "no basis in the revenue rule itself for treating criminal and civil cases differently." *Id.* at 138 (Calabresi, J., dissenting).

11

It is inescapable that in passing on whether defendants intended to violate Canadian law and deprive Canada of its right to collect taxes and duties, "our courts would have to pass on defendants' challenges to such laws and any claims not to have violated or intended to violate them." *Boots*, 80 F.3d at 587. For example, a defendant accused of wire fraud may assert a defense of legal impossibility. If what a defendant intended to do was not a violation of the law, then certainly there could be no deprivation of property for wire fraud purposes. There would be no property right with which a defendant attempted to interfere. In such a case a *United States* court would be required to determine whether the defense to a *Canadian law* would lie.

In this case, the validity and operation of a foreign law is at issue. The Second Circuit, certainly justified in wanting to punish this smuggling scheme, has attempted to side step the important concerns underlying the revenue rule. We believe that the First Circuit took the better course, and we hold that a scheme to defraud a foreign government of tax revenues is not cognizable under the wire fraud statute.

## IV.

For the foregoing reasons, we reverse appellants' convictions and remand to the district court with instructions to dismiss the indictment.

*REVERSED*

HAMILTON, Senior Circuit Judge, dissenting:

I fully agree with the majority opinion's holding that a government's right to collect taxes based upon its revenue laws is a sufficient property right for purposes of the federal wire fraud statute, 18 U.S.C. § 1343. *Ante* at 7. However, I sharply disagree with the majority opinion's holding "that a scheme to defraud a foreign government of tax revenues is not cognizable under the [federal] wire fraud statute." *Ante* at 12. Thus, on this second point, I respectfully dissent.

As the majority opinion acknowledges, "[t]he revenue rule is a `longstanding common law doctrine providing that courts of one sov-

12

ereign will not enforce final tax judgments or unadjudicated tax claims of other sovereigns.'" *Ante* at 9 (quoting *Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 109 (2d Cir. 2001)). The majority candidly admits that "this case `does not require us to enforce a foreign tax judgment as such. . . .'" *Id.* (quoting *United States v. Boots*, 80 F.3d 580, 587 (1st Cir. 1996)). However, the majority opinion goes on to hold that the common law revenue rule bars the appellants' prosecution for the multiple federal wire fraud violations as charged in their indictment because such prosecution "`amount[s] functionally to penal enforcement of Canadian customs and tax laws.'" *Id.* (quoting *Boots*, 80 F.3d at 587). This holding by the majority rests upon flawed premises and is at odds with Supreme Court precedent. Accordingly, I am constrained to dissent.

Critically, prosecution of the appellants in this case for multiple violations of the federal wire fraud statute, 18 U.S.C. § 1343, *does nothing* civilly or criminally to enforce any tax judgments or claims that Canada or the Province of Ontario has or will obtain against the appellants based upon the appellants' conduct in this case. Rather, prosecution of the appellants *enforces a criminal statute enacted by the United States Congress and contained in the United States Code* that plainly prohibits the very conduct in which the appellants engaged—*i.e.*, the use of wire communications in the United States, in interstate or foreign commerce, for the purpose of executing a scheme or artifice to defraud another of its property. Such enforcement has the singular goal of vindicating the intended purpose of the federal wire fraud statute "to prevent the use of [our telecommunication systems] in furtherance of fraudulent enterprises." *United States v. Trapilo*, 130 F.3d 547, 552 (2d Cir. 1997) (internal quotation marks omitted) (alteration in original). Here, the fact that the property at issue in the appellants' wire fraud scheme belonged to foreign governments by virtue of those governments' respective revenue laws is merely incidental to the application of the federal wire fraud statute. *Id.* (federal wire fraud statute proscribes use of telecommunication systems of the United States in furtherance of scheme whereby one intends to defraud another of property, and identity and location of victim are irrelevant). In short, the common law revenue rule does not require that we reverse the appellants' convictions and remand with instructions that the indictment be dismissed. *Id.* at 551 ("The [federal

13

wire fraud] statute neither expressly, nor impliedly, precludes the prosecution of a scheme to defraud a foreign government of tax revenue, and the common law revenue rule . . . provides no justification for departing from the plain meaning of the statute.").

The majority holding is also at odds with Supreme Court precedent holding that federal courts are not free to alter the plain language of a federal statute as a matter of policy. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) ("Courts do not, of course, have free rein to impose [common law] rules of preclusion, as a matter of policy, when the interpretation of a statute is at hand."). Admittedly, "where a common-law principle is well established . . . the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident." *Id.* (internal quotation marks and citations omitted). However, such is definitely not the situation here. There is simply no basis on which to reasonably conclude that prior to Congress' enactment of the federal wire fraud statute on July 16, 1952, well established common law provided that the courts of one sovereign would not criminally prosecute a person who devised or intended to devise a wire fraud scheme to defraud a foreign sovereign of its property rights when such property rights are in the nature of accrued tax revenue. Accordingly, the majority opinion's holding that "a scheme to defraud a foreign government of tax revenues is not cognizable under the [federal] wire fraud statute," *ante* at 12, is purely an imposition of its own expanded version of the common law revenue rule on the federal wire fraud statute *as a matter of judicial policy*. As such, the majority opinion does nothing less than judicially rewrite the plain language of the wire fraud statute so that it no longer prohibits a person from devising or intending to devise a wire fraud scheme to defraud a foreign sovereign of its property rights when such property rights are in the nature of accrued tax revenues. Because federal courts have no authority to engage in such an exercise, I cannot agree with the majority opinion. I would affirm the appellants' convictions across the board.

14